**In the Matter of CENTRAL RAILROAD COMPANY OF NEW JERSEY.**

B. No. 401–67.

United States District Court, D. New Jersey.

Nov. 30, 1976.

As Amended March 14, 1977.

Robert Timpany, Trustee, Stanley Weiss, Newark, N. J., for Central Railroad Company of New Jersey.

Kenneth Levy, Deputy Atty. Gen., Trenton, N. J., for State of New Jersey.

Roger Ward, Pitney Hardin & Kipp, Newark, N. J., for Manufacturors Hanover Trust Co.

Daniel J. Moore, Nolan, Lynes, Bell & Moore, Newark, N. J., for Lehigh Valley Railroad Company.

Carmine J. Liotta, Elizabeth, N. J., for Penn-Central Trustees.

Raymond J. Lamb, Jersey City, N. J., for B & O and C & O Railroads.

Stephen Knee, Stryker, Tams & Dill, Newark, N. J., for Committee of Interline Railroad & Southern Railroads.

Jacob I. Goodstein (N. Y. Bar), New York City, for 3¼ Mortgage Bondholders Committee.

John Broadley, Dept. of Justice, Washington, D. C., Andrew Higgins, Asst. U. S. Atty., Newark, N. J., for The United States.

John G. Harkins, Laurence Z. Shiekman, Kenneth I. Levin, Pepper, Hamilton & Scheetz, for ConRail.

John W. Noonan, Newark, N. J., Charles A. Stanziale, Jr., East Orange, N. J., for United Transportation Union.

## OPINION

WHIPPLE, Chief Judge.

The Central Railroad Company of New Jersey (hereinafter referred to as "CNJ") filed a petition for reorganization pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C. § 205 et seq. on March 22, 1967. On April 1, 1976, the bulk of the CNJ's rail assets were transferred to the Consolidated Rail Corporation (hereinafter referred to as "ConRail") pursuant to the Regional Rail Reorganization Act of 1973 as amended by the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 701 et seq. (the amended act will hereinafter be referred to as the "RRRA"). On June 1, 1976, Robert D. Timpany, the trustee of the CNJ, submitted a Plan of Reorganization (hereinafter referred to as the "Plan").

Section VI of the Plan calls for hearings on numerous issues of fact and/or law. On July 29, 1976, this Court heard oral argument on issues (1) and (3), issues of law which will be discussed in detail infra. The parties have been given ample opportunities to submit pre- and post-hearing briefs. This opinion is the result.

■ RRRA is for the purposes of this opinion a reorganization statute.[1] It supplements but does not displace Section 77. *See, In re Central Railroad Company of New Jersey,* B.N. 401–67 (D.N.J., February 2, 1976) (Letter Opinion) and the cases cited therein. Section 601(b)(4) of the RRRA makes a substantial change in the reorganization procedure for those estates, such as the CNJ, which are no longer operating rail lines. The section provides, in pertinent part, as follows:

> The powers and duties of the Commission [I.C.C.] under Section 77 of the Bankruptcy Act (11 U.S.C. 205), with respect to a railroad in reorganization in the region which conveys all or substantially all of its designated rail properties to the Corporation [ConRail], . . ., pursuant to the final system plan, and the requirement that plans of reorganization be filed with the Commission, shall *cease* upon the date of such conveyance. * * * Thereafter, such powers and duties of the Commission shall vest in the district court of the United States which has jurisdiction of the estate of any such railroad in reorganization at the time of such conveyance. *Such court shall proceed to reorganize or liquidate such railroad in reorganization pursuant to such section 77 on such terms as the court deems just and reasonable, or pursuant to any other provisions of the Bankruptcy Act, if the court finds that such action would be in the best interests of such estate.* * * * (emphasis added)

This change has the potential to streamline the reorganization process. All hearings and determinations are now to be made by the reorganization court.

The trustee's Plan seeks an early reorganization of the estate. *Plan,* Section I.D. The trustee contends that an early reorganization will materially benefit the estate in a number of ways. Early reorganization would permit "a cutting of the continued accumulation of accruals." *Plan,* p. 8. It would also allow dedication of "cash resources to higher yield opportunities—with their potential for increasing revenues and for taking advantage of the existing tax loss carryforward." *Ibid.* Early reorganization is also said to be favored by "the interests of judicial economy." *Plan,* p. 9. The trustee points to the fact that these proceedings are in their tenth year.

Finally, the trustee argues that reorganization, as opposed to liquidation, would afford "the greatest opportunity for fair treatment among the parties *inter sese.*" Plan, p. 9. The trustee proposes to deal with each party as the equities of the overall situation require.

In furtherance of his equitable goal, the trustee proposes to, in effect, hoist the governmental[2] parties on their own petard.

> The central and indispensable element of the plan proposed here is the dedication of the ConRail Preferred Stock and the Common Stock, which the estate is to receive under the Final System Plan, to the satisfaction of the high-priority claims against the estate held by the United States of America, ConRail—USRA, and the State of New Jersey—thereby leaving to the private parties the residual assets the estate retains for the satisfaction of such private claims. * * *
> *Plan,* pp. 9–10 (footnote omitted)

The trustee contends that the governmental parties, having argued that the ConRail securities were fair compensation for the assets of the estate, cannot now argue that they would not be fair compensation for their high priority claims. The governmental gander, however, would appear to want no part of the sauce it forced upon the goose. The government parties prefer to be paid in cold, hard cash.

---

1. This Court need not involve itself in the controversy over whether the RRRA is a reorganization statute or a condemnation statute.

2. The United States of America, The State of New Jersey and its political subdivisions, the United States Railway Association ("USRA"), and ConRail. See Memorandum and Order Directing Preliminary Proceedings issued by the Special Court in Misc. No. 76–1 on June 16, 1976, page (i) fn. 7.

The Plan divides the estate's creditors into ten classes listed in descending order of priority. Class A consists of such costs of the reorganization proceedings and the Plan's implementation as this Court shall allow. Non-employee personal injury claims are also included in this class. Class B contains the claims of the United States and the State of New Jersey under certain trustee certificates. Class C covers the § 211(h) claims to reimbursement by Con-Rail and/or USRA.[3] Class D consists of such state and local tax claims as shall be allowed.

The interline railroad's claims for thirty-five monthly cash payments under the pre-petition interlines settlement comprise Class E.[4] Class F includes all other administration claims. Class G consists of the mortgage bondholders. Class H comprises the claims of the United States under certain trust notes.[5] All other pre-petition claims are contained in Class I. The Plan makes no separate provision for "six-month" creditors. Finally, the interest of the stockholder is denominated Class J.

Class A claims will be paid in cash or assumed by the reorganized company. Classes B, C, and D are to be satisfied, initially, by means of the ConRail securities. Class E claims will be paid in thirty-five monthly cash installments.

The Class F creditors will receive certain installment notes to be issued by the reorganized company. The Class G creditors, i. e., the bondholders, will receive the initial common stock of the reorganized company. The Class H debts will be satisfied by the release of the securities of certain of the CNJ's subsidiaries. The stockholders, Class J, will receive nothing unless certain contingencies, as stated in Section II B of the Plan, should occur.

The Trustee has proposed that two questions of law relating to the Plan be decided before extensive hearings are held. Those issues are framed, in Section VI of the Plan at page 25, as follows:

(1) whether as a matter of law there is any impediment to the proposed utilization of the ConRail securities;

\* \* \* \* \* \*

(3) the propriety of the trustee's position that ConRail has primary responsibility for employee-related claims including the question of whether the estate is obligated for pension benefits and, if so, the extent of the liability and whether such liability should be satisfied as an offset in the valuation proceedings;

\* \* \* \* \* \*

These are the issues now before the Court.

■ An early determination of issue (1) is certainly in the best interest of the estate and "judicial economy." Were the Court to determine that, *as a matter of law,* the proposed use of ConRail securities was impermissible, there would be no need to hold further hearings on the Plan. Since there is no likelihood that the parties who are to receive the securities would consent, such a legal determination would not be premature. See *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Such a determination would be similar to a motion for partial summary judgment. F.R.Civ.P. 56.

Most of sub-issues contained in issue (3) are also ripe for decision at this time. A resolution of those issues would more clearly define the relationship between the estate and ConRail as governed by RRRA. The Court refused to decide such issues in the context of the Section 211(h)(3) hearing when urged to do so by the government parties. The future time alluded to in that opinion has now arrived. *Matter of Central R.R. Co. of New Jersey,* 412 F.Supp. 927, 934 (D.N.J., 1976).

---

3. The initial claim would be ConRail's, but pursuant to section 211(h)(5)(A) such claims could become URSA's.

4. See Letter Opinion of June 28, 1976.

5. These notes pre-date the filing of the reorganization petition.

In October 1976, the Rail Transportation Improvement Act was signed into law. This Act contains amendments to certain portions of the RRRA, as already amended by the RRRRA, which could have substantial impact upon the issues before the Court. Because this Act has made its appearance well after the issues at bar were briefed, argued and considered by the Court, it seems most appropriate to render a decision based upon the law as it existed at the time of oral argument. Any party contending that the new Act compels a different result will be given an opportunity to brief that contention. After answering briefs have been filed, the Court will hear oral argument, if the parties so desire.

In considering the applicability of the changes worked by the new Act, the Court will be concerned with several questions apart from the construction of the amendments. First, to the extent the amendments change the prior law, do those changes interfere with any rights which may have become vested under the previous law. Second, to the extent the amendments purport only to clarify prior law, what effect must be given to later legislative "clarification." The Court does not intend to limit the parties to these questions alone.

## I. THE USE OF CONRAIL SECURITIES

■ Issue (1) relates to the trustee's proposal that the ConRail securities to be received by the estate in exchange for the transferred rail properties [6] be used to satisfy the high priority debt owing to the United States, the State of New Jersey, certain of its political subdivisions, USRA, and ConRail. Those parties do not consent to the trustee's proposal. They argue that such a treatment of administrative claims violates certain provisions of Section 77, as well as the RRRA and other law.

While this Court is not unsympathetic to the trustee's goal of dealing equitably with the administrative claimants *inter sese,* the Plan's proposed use of the securities cannot be sustained as a matter of law. The Court is persuaded that Section 77 of the Bankruptcy Act requires that administrative expenses be paid in cash, at least if the administrative claimants do not consent to an alternative means of payment.

Section 77(e), in pertinent part, provides as follows:

* * * [T]he judge shall approve the plan if satisfied that: . . . (3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection (c), paragraph (12) of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same.

The parties who oppose the Plan argue that this statutory language mandates the payment of administrative claims in cash. The trustee takes a contrary position.

The governmental parties cite several cases and I.C.C. reports to support their position. In *Group of Investors v. Milwaukee R. Co.,* 318 U.S. 523, 554, 63 S.Ct. 727, 744, 87 L.Ed. 959 (1943), the Supreme Court characterized section 77(e)(3) claims as "demands on the cash resources of the estate or the new company." It should be noted, however, that the Court was not specifically ruling upon a plan of reorganization which proposed other than cash payment. In *New York, Ontario & Western Ry. Reorganization,* 295 I.C.C. 346, 361 (1956), the I.C.C. report rejected two proposed plans of reorganization and recommended dismissal of the reorganization.

Under the statute, it is necessary that a plan, if it is to be approved, shall provide for the payment of all costs of administration in cash. As hereinbefore indicated, neither proposed plan, in terms or method of treatment, makes such provi-

---

6. *See,* section 303. The trustee's proposal does not include the certificates of value ("cv's") which are part of the RRRA compensation.

sion, nor would it be possible under the reorganizations contemplated by them, to pay cash, either presently or in the foreseeable future, substantial portions of the administration expenses, including large amounts of unpaid tax accruals, both federal and local. * * *

295 I.C.C. at 361. Again, the plans of reorganization under consideration did not call for payment through securities.

In *St. Louis-San Francisco Ry. Reorganization,* 257 I.C.C. 399, 416 (1944), the report modified a plan which it then approved.

The bondholder's plan provides that the expenses of reorganization as allowed by the Court, subject to the provisions of Section 77 of the Bankruptcy Act, shall be paid in cash or assumed by the reorganized company as a cost of administration prior in lien to the new securities issued under the plan. In our view, and in order to conform to plans heretofore approved by us in other cases, it should be provided that such expenses shall be paid in cash. (See also *In Re New Housing Corporation,* 117 F.2d 569, 571). The approved plan will so provide. * * *

257 I.C.C. at 416. *In Re New Era Housing Corporation,* 117 F.2d 569 (3d Cir., 1941), cited in the report, is a case dealing with the former section 77B of the Bankruptcy Act. Section 77B(6)(3) is similar to Section 77(e)(3) except that it specifically requires that payment be made in cash with one stated exception. As will be seen *infra,* the phrase "in cash" was dropped in subsequent revisions, but the revised section has been interpreted to require cash payment.

In *Alton R. R. Reorganization,* 261 I.C.C. 343, 382 (1945), the report stated:

The expenses of the reorganization as allowed by the court, subject to the provisions of Section 77 of the Bankruptcy Act, should be paid in cash. See *St. Louis-S. F. Ry. Co. Reorganization,* decided July 4, 1974, 257 I.C.C. 394. We fur-

ther find that such claims are not affected by the plan.

Again, the Commission was not faced with a plan similar to the plan before the Court. *See* also, *Rutland R.R. Reorganization,* 267 I.C.C. 89, 125 (1946); *Alabama, Tennessee & Northern R.R. Reorganization,* 247 I.C.C. 453, 468-9 (1940); *Erie R.R. Reorganization,* 239 I.C.C. 653, 731 (1940); *Spokane Ry. Reorganization,* 228 I.C.C. 387, 407 (1938).

The trustee argues that section 77(e)(3) does not govern the operating expenses incurred during reorganization. According to his interpretation, the phrase "costs of administration and all other allowances" refers exclusively "to matters such as the trustee's salary, allowances and disbursements of various counsel and representatives of interested parties, and auctioneer, accounting and appraisal fees and the like." Trustee's Initial Brief, page 45. The trustee cites no cases which make the distinction he urges on the Court.

█ This distinction cannot be supported in the light of the above cited cases. In *Group of Investors v. Milwaukee R. Co., supra,* the Supreme Court characterized claims against an estate for post-petition net income and rent as section 77(e)(3) claims. 318 U.S. at 554, 63 S.Ct. 727. In *New York, Ontario & Western Ry. Reorganization, supra,* the Commission characterized tax accruals as costs of administration. 295 I.C.C. at 361. This Court is of the opinion that "costs of administration" includes debts incurred in continuing the operation of the railroad pending reorganization. These creditors of the reorganization are to be distinguished from the creditors of the debtor whose claims may be altered or modified by the issuance of new securities or otherwise. Section 77(b).[7]

The trustee also argues that, even if subsection (e)(3) governs the claims involved here, it does not mandate payment in cash. He contends that it merely forbids payment in the securities of the reorganized company except to subsection (c)(12) claimants.[8]

---

7. The trustee sought to classify post-petition operating expense claims as section 77(b) claims. In this Court's opinion, the subsection (b) claims are pre-petition claims.

8. The trustee argues that subsection (c)(2) claimants are not permitted to receive securi-

Payment in other types of securities are not, according to this argument, excluded. The trustee seeks to push aside the weight of the traditional interpretations requiring cash payment by characterizing them as *dicta. See, Regional Rail Reorganization Act Cases,* 419 U.S. 102, 150–151, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). While it is true that none of those authorities were faced with the factual situation now before this Court, the long line of interpretation referred to cannot be taken lightly. The fact that no cases arose requiring a direct confrontation of the issue would seem to indicate a uniformity of interpretation.

Besides having a strong foundation in the wording of the statute, the traditional rule that reorganization expenses must be paid in cash makes sense.[9] The reorganization process depends in large part upon the ability to continue operations pending reorganization. The continued reorganization depends, in turn, upon the willingness of other business and governmental entities, as well as employees, to continue to deal with the trustee of the bankrupt estate. If they cannot be persuaded to extend credit for such necessities as fuel, supplies, and labor, the reorganization process would be severely handicapped, if not entirely frustrated. Thus, it would seem logical to ensure the potential administration creditors that they will be paid in cash, not in securities of the reorganized company, securities of other companies, or in kind, i. e., a box car.[10]

Both sides point to the New Haven reorganization to support their respective positions. In *In Re New York, New Haven And Hartford Railroad Co.,* 304 F.Supp. 1121 (D.Conn.1969), the district court disallowed a plan provision to pay certain subsection (c)(12) claimants with installment notes. They did not agree to such treatment. The court wrote:

> ties because there might be a conflict of interest.

9. Even if the trustee's statutory argument is correct, there would seem to be a judge-made rule that such expenses be paid in cash. The analysis which follows would support such a rule.

* * * These objections are sustained as a matter of law, for § 77(e) contemplates payment in cash, unless the persons within (c)(12) are willing to be "paid in securities provided for in the plan." 304 F.Supp. at 1126. The opposing parties cite this case in support of their position. There can be no doubt that it is a clear restatement of the traditional position concerning payment in cash.

The trustee, however, points to other aspects of the New Haven reorganization which contradicts the traditional approach. The reorganization plan approval by the I.C.C. did provide for the payment of some reorganization expenses with installment or income notes. *See, Pennsylvania R. Co.— Merger—New York Central R. Co.,* 344 I.C.C. 25,113 (1968). There was evidently no objection to this treatment, except by the subsection (c)(12) claimants, and the plan was tentatively approved in the same opinion which the opposing parties cite for the opposite proposition. *In Re New York, New Haven And Hartford Railroad Co., supra.* The plan was remanded to the I.C.C. for modification. The district court did not, on its own motion, disapprove the use of notes instead of cash.

While the *New Haven* case weakens the argument that administrative expenses *must* be paid in cash, it does not defeat it. Instead, it would appear to put a new gloss on the rule. Such claims must be paid in cash, unless those to be paid otherwise, including non- (c)(12) claimants, consent. This is not entirely consistent with the language of subsection (e)(3), which would seem to allow for payment in securities to (c)(12) claimants only.

The New Haven construction would be consistent with the statutory construction found in the State's Post-Hearing Brief. The State points out that § 77 as first

10. See, *In Re New York, New Haven And Hartford Railroad Co.,* 304 F.Supp. 1121 (D.Conn. 1969) where trustee certificates are discussed in a similar vein.

enacted in 1933 did not contain the present section 77(e)(3). Section 77B, a corporate reorganization statute, was added in 1934 with a provision requiring "the payment in cash of all costs of administration and other allowances" with an exception similar to that found in section 77(e)(3). In 1936, section 77 was amended to include subsection (e)(3). 49 Stat. 911, 918 (1936). However, this subsection does not mention cash. A 1936 proposal to eliminate the phrase "in cash" from section 77B, H.R. 12889, was not passed. Shortly thereafter, section 77B became Chapter X. 52 Stat. 840, 896 (1938). Section 216(3) of Chapter X makes no reference to cash or securities in paying "costs and expenses of administration and other allowances." [11]

The State places great reliance on the following quotation from *Collier's:*

> \* \* \* In the *Analysis of H.R. 12889,* which bill was a forerunner of Chapter X and contained the same language now found in § 216(3), it was said: "The omission of the words 'in cash' permits the elimination in respect to payment of the items of costs, expenses, and other allowances in securities, without changing the intended purpose of the whole clause" Professor Gerdes [Corporate Reorganizations: Changes Effected by Chapter X of the Bankruptcy Act (1938) 52 Harv.L. Rev. 1, 29–30] has suggested that while § 216(3) is open to the interpretation that securities may be offered as payment in any case, the better construction is that the altered language has not deprived claimants of their option to insist on cash. This seems to be the correct view, in light of this statement of the draftsman just quoted. (footnotes omitted) *Collier on Bankruptcy,* Art. X, ¶ 10.05, p. 431.

The conclusion is that, in Chapter X, the claimants may approve reasonable alternatives acceptable to the claimants.[12] The difficulty with applying this reasoning to section 77(e)(3) is that, unlike section 216(3) which mentions neither cash nor an exception for payment in securities, section 77(e)(3) mentions the exception but not cash.

The approach taken to section 216(3) is an appealing one, allowing a maximum of flexibility. It preserves the right of administration creditors to demand cash, thus inducing them to deal with the trustee, while allowing them to accept securities or other means of payment if they wish. As the New Haven reorganization demonstrates, the identical approach can be helpful in a section 77 reorganization. However, the consent of the claimant is presupposed. The *New Haven* case does not support the trustee's position that consent is not required.[13]

The opposing parties also argue that the absolute priority rule would forbid the proposed use of ConRail securities. This direct reliance on the absolute priority rule is misplaced. That rule merely requires that senior claimants receive "value equal to [their] claims." *Consolidated Rock Co. v. Du Bois,* 312 U.S. 510, 530, 61 S.Ct. 675, 687, 85 L.Ed. 982 (1941).

> \* \* \* So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of "fair and equitable" are satisfied. *Ibid.*

Flexibility is still to be the hallmark of reorganization, as long as the claimants are fully compensated in order of seniority. Thus it would be a question of fact, not law,

---

**11.** This phrase speaks of "costs and expenses", unlike (e)(3) which speaks only of "costs". However, it does contain the phrase "and other allowances" which the trustee argues, in connection with (e)(3), indicates an intention to refer to trustee and attorney allowances only. Section 216(3) of Chapter X has been interpreted to include operating expenses, *See, Collier on Bankruptcy,* 6A, ¶ 10.06, p. 437, *et seq.* The Court sees no reason to interpret the sections differently, despite the absence of "expenses"

in (e)(3). The statutes were drafted at different times.

**12.** Thus the judge could find a proposal to issue securities to a trustee unreasonable in light of the possible conflict of interest.

**13.** Since consent is required, it seems clear that the Court's "cramdown" power does not extend to administration claimants.

as to whether the Plan violates the absolute priority rule. Even though the type of security received by senior claimants is "inferior" to that received by junior claimants, the absolute priority rule is not violated if the senior claimant receives "full compensatory treatment."

█ The government parties do, however, advance an argument which demonstrates the difficulty of reaching a factual determination as to the value of the ConRail securities for the purposes of the absolute priority rule. The ConRail securities are, at present, without market value. The opposing parties, especially USRA, argue that this Court is without jurisdiction to value the ConRail securities. *See,* USRA's Initial Brief, p. 2 *et seq.,* (citing sections 209 and 303 of RRRA).

Section 206(f) provides, in part, that the Final System Plan "shall designate . . . the value of the securities" to be received in exchange for the rail properties. Section 209(a) provides that the Final System Plan may be reviewed as to the value of the securities, once the Plan has become effective. Section 209(e) grants exclusive jurisdiction to determine certain issues to the Special Court. It is not clear, however, whether these issues include the valuation given to the securities in the Final System Plan. Section 306(c)(5) mandates a procedure for determining the fair market value of the ConRail securities in determining the value of the Certificates of Value. Thus, it would appear that the valuation given to the securities by the Final System Plan pursuant to Section 206(f) and the Special Court pursuant to section 303(c) are not the ultimate valuations for the purposes of compensation.

It is clear that, even if this Court has jurisdiction to determine a value, there would be difficulties inherent in doing so. ConRail is less than a year old and, according to its own optimistic projections, will not become profitable until the 1980's. The trustee argues that the governmental parties should be precluded from disputing the USRA valuation. This is an appealing argument. It would certainly seem inconsistent for USRA to argue before the Special Court that the securities have X value, while taking a contrary position in this Court. See, *Scarano v. Central R. Co. of N.J.,* 203 F.2d 510, 513 (3d Cir. 1953). However, it should be noted that section 206(f) *requires* USRA to evaluate the securities, while sections 303(c) and 306(c)(5) provide procedures to review the USRA evaluations. The Court has some doubts as to the propriety of applying the preclusion doctrine to a litigant who is required by statute to take a position on the value of the securities.[14] The Court also doubts whether the trustee can argue with the USRA valuation in the Special Court, while demanding that it be followed in this Court.[15] Were the Court to evaluate the securities here, they might well be given different values by other tribunals in the future.[16]

The Court can not but conclude that no factual finding could be made which would enable it to be sure that the governmental parties would receive the compensation which the absolute priority rule mandates they receive. Had the Plan provided for the participation of the governmental parties in the assurances provided by the Certificates of Value, the indirect absolute priority rule argument might not have been a factor in the decision which the Court has reached.

In light of the Court's decision on the section 77(e)(3) and indirect absolute priority rule arguments, there would be no point in exploring the other arguments in opposition to the Plan. The trustee's equitable subordination arguments are basically factual and would not, even if successful, inure to his benefit by preserving the Plan. They may be raised in opposition to any future

---

14. It is also unclear whether the doctrine would apply to the other objecting parties.

15. The Court hastens to note, however, that the trustee has in no way adopted the USRA valuation in these proceedings.

16. If each reorganization court were permitted to evaluate the securities, there could be numerous conflicting valuations.

requests for payment of administration claims, if the trustee wishes to press them. The Court has not formed any opinion as to their validity or invalidity.

The Court has not ignored the trustee's argument that section 601(b)(4) works a substantial change in the Court's power under section 77. The argument that this subsection is unimportant because contained in Title VI, which is entitled "Miscellaneous Provisions" is, of course, ridiculous. However, the Court is not persuaded that section 601(b)(4) would allow the Court to approve the Plan. There is no indication that section 77(e)(3) is affected by it. Nor is the Court convinced that the absolute priority rule is abrogated. But even if a "just and reasonable" standard differs from a "fair and equitable" one, the problem of valuation remains the same.

For the reasons stated above, the answer to issue (1) must be yes, there is a legal impediment to the use of ConRail securities as proposed in the Plan.

## II. LIABILITY FOR EMPLOYEE CLAIMS

Turning now to issue (3), it can readily be seen that there are actually five subissues subsumed under this one label. The five subissues relate to the estate's liability for (a) the wages earned during the final two weeks of the CNJ's operation,[17] (b) vacations earned during 1975 and 1976, but not yet taken, (c) claims arising under the collective bargaining agreements which are subject to § 3 of the Railway Labor Act, 45 U.S.C. § 153, (d) claims by employees or their personal representatives for personal injury or death, and (e) the funding of certain pension plans.

The trustee had not provided for the satisfaction of these claims in the Plan because he contends that they became the responsibility of ConRail at conveyance. ConRail and USRA take the opposite position.

17. The CNJ payroll was two weeks behind at conveyance. ConRail continued that policy and applied to this Court for permission to seek section 211(h) funds to meet the first and second post-conveyance payrolls due to the former CNJ, now ConRail, employees. Permis-

They argue that the ultimate responsibility for such claims rests with the estate, even though ConRail may be required or permitted to make payment in the first instance. *See,* sections 211(h); 504(a), (e) and (g) of RRRA. Even though the Plan has not been approved, the Court will resolve some of the issue (3) problems.

### A. The Non-Pension Funding Claims

Two types of claims are specifically mentioned in the Act.

504(e) *Liability for Employee Claims.* —In all cases of claims by employees, arising under the collective bargaining agreements of the railroads in reorganization in the region, and subject to section 3 of the Railway Labor Act (45 U.S.C. 153), [ConRail] shall assume responsibility for the processing of any such claims, and payment of those which are sustained or settled on or subsequent to the date of conveyance, . . ., and shall be entitled to direct reimbursement from [USRA] pursuant to section 211(h) of this Act. In those cases in which claims for employees were sustained or settled prior to the date of conveyance, it shall be the obligation of the employees to seek satisfaction against the estates of the railroads in reorganization which were their former employers.

504(g) *Assumption of Personal Injury Claims.*—All cases or claims by employees or their personal representatives for personal injuries or death against a railroad in reorganization in the region arising prior to the date of conveyance of rail properties, . . ., shall be assumed by [ConRail]. [ConRail] shall process and pay any such claims that are sustained or settled, and shall be entitled to direct reimbursement from [USRA] pursuant to section 211(h) of this Act.

It only remains for the Court to determine what is meant by the above sections.

sion was granted. *See,* Orders No. 837 and 839. It is interesting to note, in light of the assertions at oral argument that section 211(h) loans could only be made to pay obligations of the estate, that these Orders specifically left the question of ultimate liability open.

Section 504(e) relates to employee claims which arise under collective bargaining agreements *and* which are subject to Section 3 of the Railway Labor Act. These are claims arising out of

> disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of the agreements concerning rates of pay, rules, or working conditions . . . . 45 U.S.C. § 153, First (i)

See *Slocum v. Delaware, L. & W. R. Co.,* 339 U.S. 239, 242, 70 S.Ct. 577, 94 L.Ed. 795 (1950); *U.S.Code Cong. & Admin.News,* 1976, Vol. 1, p. 103, transcript of July 29, 1976, p. 56. Thus it would seem logical to conclude that the wage and vacation pay claims disputes are *not* covered by section 504(e). The dispute is between the CNJ and ConRail, not between employee and employer. There is no dispute that the money is owed. Section 504(g) relates to personal injury claims made by employees or their personal representatives. The wording of the two sections is similar and they may be treated together.

The trustee points to the use of the word "assume" in pressing his argument that the claims involved become the financial responsibility of ConRail after conveyance. Section 504(e) says that ConRail "shall assume responsibility for the processing of any such claims, and payment" of those which are sustained or settled. Only those claims which have not been "sustained or settled" before conveyance are to be taken care of by ConRail. Those which were sustained or settled prior to conveyance remain the direct responsibility of the estate. The language in section 504(g) is only slightly different. That section provides that all personal injury claims "shall be assumed by" ConRail. It further provided that ConRail "shall process and pay" such claims as are sustained or settled. It does not distinguish between claims which are sustained or settled before and after conveyance.

The trustee's argument would be persuasive *if* both sections did not further provide that ConRail "shall be entitled to direct reimbursement from the Association [USRA] pursuant to section 211(h) of this Act." This choice of language by the Congress complicates the task of interpreting the two sections. It is not entirely clear from this language whether or not ultimate reimbursement from the estate is contemplated. The trustee argues that such reimbursement is not contemplated, because the sections specifically state that reimbursement is to come from USRA. USRA and ConRail argue that reimbursement by the estate is required by section 211(h).

Before turning to section 211(h), it should be noted that the trustee's argument that the use of the word "assume" is dispositive of the issue cannot prevail in this instance. The trustee maintains that "assume" is a "term of art" which means "to take upon oneself the obligations of another." Trustee's Initial Brief, page 54. But it is clear from the language of the two sections that ConRail is only to take on the responsibility of processing and paying the claims in the first instance. ConRail, it should be remembered, has most of the records and manpower needed for this job. Both sections provide for reimbursement from USRA and perhaps, or at least so USRA and ConRail argue, ultimately from the estate. In neither case does the ultimate financial responsibility rest with ConRail.

Section 211(h) was the subject of this Court's Opinion of March 31, 1976, published at 412 F.Supp. 927. In that Opinion the Court quoted from legislative history in order to explain the reason for the enactment section 211(h).

> Section 211(h) was added to the RRRA in February of this year. The subsection was not included in the Senate Bill, S. 2718, but was added by House Amendment.
>
> 'The House Amendment also authorized section 211 loans to be made to ConRail, . . . ., for the payment of certain obligations of the railroads in reorganization, where such payments were necessary to permit continued, orderly opera-

tions. The provision was designed to provide some assurance of a source of continuing payments to employees, shippers, suppliers and others within the framework of the loan program. * * * U.S. Code Cong. & Admin.News, 1976, Vol. 1, p. 199.'

' * * * Loans can be made to ConRail . . . to enable them to pay obligations of the bankrupt carriers in a timely fashion that avoids any disruption in orderly business relationships. However, *this provision does not relieve the bankrupt carriers from the ultimate responsibility for these obligations and ensures that they will be paid as promptly as possible as administrative claims in each bankruptcy court. * * * '* (emphasis added) *Id.* at p. 147

The subsection was designed to meet the projected post-conveyance shortfall which was the subject matter of the hearings held before this Court on December 1 and 3, 1975 and January 13, 1976. See Opinion of December 18, 1975 and oral Opinion of February 4, 1976. *Matter of Cent. R.R. Co. of New Jersey,* 412 F.Supp. at 932.

*See* also, *Matter of Penn Cent. Transp. Co.,* 411 F.Supp. 1079, 1082–1083 and 1085 (E.D. Penn., 1976).

▮ There can be no question that § 211(h) was designed to provide funding to meet the transferor estates' cash flow problems, but not to relieve them of the financial responsibility for the obligations paid. USRA is to make a loan to ConRail, which will, in turn, pay an estate's creditor for that estate's account. ConRail is then entitled to seek reimbursement from the estate on a high priority basis. After being reimbursed by the estate, ConRail would then repay USRA. If ConRail is unable to recover from the estate, except under certain circumstances not here relevant, USRA will forgive the loan and succeed to ConRail's

claim for reimbursement. No reasonable reading of section 211(h) could produce an interpretation whereby USRA would be required to make a direct grant of funds to ConRail outside of the loan program, i. e., without the benefit of an administration claim against the estate whose obligation has been paid.

▮ Section 211(h)(1) makes specific reference to subsections (e) and (g) of section 504, as well as using language almost identical to that used in those subsections to describe the types of claims involved. After authorizing USRA to enter into loan agreements with ConRail for the specific purpose of paying "existing or prospective obligations" of the transferor estates, the subsection provides that such obligations, shall be limited to, among others,

". . . (iv) claims of employees arising under the collective bargaining agreements of the railroads in reorganization and subject to section 3 of the Railway Labor Act . . .; [and] (v) claims of all employees or their personal representatives for personal injuries or death and subject to the provisions of Employers' Liability Acts (45 U.S.C. 51–60); . . . (emphasis added)

No *loan* shall be made unless USRA finds, *inter alia,* that ConRail is *"entitled to a loan* pursuant to subsection (e) and (g) of section 504 of this Act." [18] (emphasis added). Section 211(h)(4)(c) clearly states that ConRail "shall have a *direct claim, as a current* expense of administration, for reimbursement from the estate . . . for all obligations of such estate . . . which are paid" by ConRail. This indicates a clear congressional intent that such claims remain the ultimate responsibility of the estates.

There is no such clear indication of a contrary intent to be found in subsections (e) and (g) of section 504. In fact, those subsections provide that reimbursement will

---

18. It would seem that ConRail is required to pay all section 504(e) and (g) claims which are sustained or settled out of its own funds, if loans have not yet been arranged. ConRail then becomes "entitled" to section 211(h) loans. It appears, therefore, that USRA need

not have determined that such claims be paid. Section 211(h)(1). This statutory scheme may explain why subsections (e) and (g) of section 504 speak of direct reimbursement from USRA. ConRail is to pay the claims first, and then seek loan funds from USRA.

be pursuant to section 211(h). The fact that those subsections seem to speak in terms of direct reimbursement from USRA instead of from the estates does give rise to some small ambiguity. That seeming ambiguity could be explained by the legislative history outlined in ConRail's Initial Brief, pages 22–25. It could also be explained as suggested in footnote (2).[19] In any event, this Court is convinced that a reading of the statute as a whole, keeping in mind the legislative purposes, requires the conclusion that the claims remain the ultimate liability of the estates. See *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 631–632, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Ideal Farms, Inc. v. Benson*, 288 F.2d 608, 613–614 (3d Cir. 1961), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963). Judge Fullam, apparently with some misgivings, found a construction which places ultimate responsibility on the estates to be "reasonable". *Matter of Penn. Cent. Transp. Co.*, *supra*, 411 F.Supp. 1089 (E.D.Penn., 1976). This Court does not share his misgivings.

Section 208(a) and (b) of the most recently enacted amendments to the RRRA do not appear to mandate a result different than that reached by the Court on the basis of prior law. It is not expected, therefore, the issues raised by sections 504(e) and 504(g) of the RRRA will require rebriefing or reconsideration.

■ No provision of the RRRA makes specific reference to the vacation pay issue. The trustee argues that section 504(a) requires ConRail to assume liability for all vacations earned but not taken prior to conveyance. ConRail contends that vacation pay remains the obligation of the estate. USRA, faced with adverse determinations from other reorganization courts, urges that this issue be deferred pending the outcome of three appeals now pending before the Third Circuit. The Court sees no reason to defer decision pending the outcome of the appeals. It would be beneficial to have the issue resolved as the former CNJ employees begin to take their vacations.

Section 504(a), in pertinent part, provides as follows:

> Until completion of the agreements provided for under subsection (d) of this section, the Corporation shall, as though an original party thereto, assume and apply on the particular lines, properties, or facilities acquired all obligations under existing collective-bargaining agreements . . . .

Subsection (d) of section 504 requires ConRail and the various unions to negotiate new agreements based upon ConRail's operation as a single entity. Pending the completion of such agreements, the pre-conveyance agreements of each transferor will govern ConRail's relationship with the former employees of that transferor. Apparently most or all of the estates were following the same agreements. *See Matter of Penn. Cent. Transp. Co.*, 411 F.Supp. 1079, 1087 (E.D.Penn., 1976).

The language of the subsection would appear to be clear and ambiguous. ConRail is to "asume and apply" "all obligations under existing collective bargaining agreements" "as though an original party thereto." ConRail steps into the shoes of the transferor estates. This subsection contains no subsequent indication that the word "assume" is not to be given the interpretation which the trustee sought to give it in subsections (e) and (g). Here, there is no indication that "assume" does not mean "to take upon oneself the obligations of another." *See, Matter of Penn. Central Transp. Co.*, 533 F.2d 1347, 1360 (3d Cir. 1976) (Opinion of Gibbons, J.); *Larson Construction Co. v. Oregon Automobile Ins. Co.*, 450 F.2d 1193, 1195 (9th Cir. 1971).

This interpretation is strengthened by the clause which requires ConRail to "*assume*

---

19. At page 57 of the Trustee's Initial Brief, the trustee points out that legislation has been introduced in Congress to change the wording of the sections under discussion. The trustee appears to argue that this is an indication that some members of Congress wish to change wording *because* they consider the wording to require the interpretation urged by the trustee. An equally plausible explanation is a desire to correct the ambiguity to which the wording gives rise, even though the trustee's interpretation is incorrect.

and apply" the agreements "*as though an original party thereto.*" (emphasis added) This clearly indicates that ConRail is to be substituted for the transferor estate in each collective bargaining agreement ConRail purports to discern a contrary congressional intent in the use of the particle "an" instead of "the" in the above quoted clause. *See,* ConRail's Initial Brief, page 20. Since an agreement, by its very nature, has two parties, this Court sees no significance whatever to the use of "an" as opposed to "the".

ConRail also argues that the interim nature of the subsection bespeaks an intent contrary to what appears to be the plain meaning of the words. The application of the existing agreements is temporary because Congress wisely foresaw that ConRail would function more smoothly if each class of employee was bound by a single agreement based upon ConRail's operation as a single unit. Until such time as the new agreements are negotiated, each employee of ConRail is subject to the terms of the agreement with the former employer, as if ConRail were that former employer. This does not mean that the compensation and vacation earned under the existing agreements, before *or* after conveyance, are to be extinguished by the new agreement. It could not be argued that liabilities incurred after conveyance terminate when the new agreement becomes effective. Pre-conveyance obligations would be no different.

ConRail argues that, even if the liability shifted to ConRail, it would shift back to the estates when the new agreements became effective. Nothing is contained in the statute to indicate that there is a shifting back. In discussing the assumption of the equipment obligations pursuant to section 303(b)(3), Judge Gibbons said that, following the assumption, "the direct liability of the debtor estate would be *extinguished.*" (emphasis added) *Matter of Penn. Central Transp. Co.,* supra, 533 F.2d at 1360.

In his section 211(h) opinion in the Erie Lackawanna reorganization, Judge Krupansky wrote as follows:

Section 504(a) of the Act provides that ConRail assumes all union agreements "as though an original party thereto." This statutory language *mandates* ConRail to relieve the EL estate of vacation pay liability of all union employees, both for vacation earned in 1975 and not taken prior to conveyance, as well as any vacation allegedly earned to date in 1976. This section comports with the economic reality that vacations like wages are paid as current expenses from current receipts which ConRail as successor will assume. ConRail's argument to the contrary is not persuasive. *The congressional intent is reflected in the language of the appropriate section of the Act* as heretofore interpreted by statements of counsel for the Government before the Special Court, indicating EL would be relieved of liability for vacation pay by reason of Title V of the Act "if it were reorganized" under the Act. (Document No. 1495)

Thus ConRail succeeds to the properties of EL as a result of the "reorganization." The succession has been mandated by Congress to be orderly, uninterrupted and nondisruptive to the extent that Section 502(b) of the Act requires continuity of employment by ConRail of all EL employees on and after the conveyance date. EL's vacation obligation is one which to ConRail succeeds as the "reorganized" company absent specific provisions in the Act to the contrary. *The explicit provision* in Section 504 for *assumption* of union agreements would appear to be a congressional recognition of this result. (emphasis added) *Matter of Erie Lackawanna Ry. Co.,* B.No. 72–2838 (N.D.Ohio, March 31, 1976), pp. 8–9

The Court assumes that USRA and ConRail have appealed this ruling to the Sixth Circuit.

Judge Fullam, noting that "[i]t would have been helpful if Congress had inserted a provision specifically listing the appropriate breakdown of liabilities" as between ConRail and the estates, explored the vacation pay issue in detail. He held that "[i]t

is *clear* that the vacation pay claims now under discussion fall within the purview of § 504(a)." (emphasis added) *Matter of Penn. Cent. Transp. Co., supra*, 411 F.Supp. at 1088.

> * * * ConRail simply cannot comply with the requirements of § 504(a) except by paying the wages of employees from and after conveyance date, during vacation periods as well as other periods. *Id.* at 1090

This Court is in agreement with that conclusion.

As Judge Fullam points out, ConRail itself will receive considerable benefit from the vacations taken after conveyance.

> To state that an employee "earns" his 1976 paid vacation by services performed in 1975 does not necessarily mean that *all* of the benefits flowing to the employer, in exchange for which the paid vacation is given, are attributable to the earlier year. Implementation of a paid vacation policy produces benefits to the employer during the vacation year as well. Employers who are physically and mentally refreshed are likely to be more efficient. The policy of providing longer vacations for employees with seniority tends to assure a stable labor force, and to provide the employer with desirable levels of experienced workers. * * * *Id.* at 1087

ConRail, and not the transferor estates, will reap the benefits described above.

Another important consideration involves the difference in time between the vesting of 1976 vacation eligibility and the actual entitlement to receive a paid vacation. The former CNJ employees became eligible for 1976 vacations by working a specified period during 1975. However, they are required to work one hundred days, or the equivalent mileage, during 1976 in order to be entitled to receive the paid vacation. April 1, 1976 was the 92nd day of the year. If employment had been terminated on that date, no employees would have been entitled to a 1976 paid vacation. Section 504(a) operates to safeguard the employees interests in vacation by substituting ConRail for the transferor estates. Once an employee

has worked the remainder of the requisite one hundred days for ConRail, the employee is entitled to a paid vacation. *See, Matter of Penn. Cent. Transp. Co., supra*, 411 F.Supp. at 1086; *Matter of Erie Lackawanna Ry. Co., supra*, pages 9–10.

Finally, Judge Fullam points to a purely practical consideration. If Congress had intended vacation pay to remain the ultimate responsibility of the estates, section 211(h) funding would be inadequate to meet the situation. The Penn Central alone has accrued vacations of $70 million, a little less than one-third of the $230 million appropriated for *all* of the estates to meet *all* of the expenses covered by section 211(h). 411 F.Supp. at 1090. Judge Fullam concludes that Congress could not have intended such a result.

ConRail asserts that an interpretation of section 504(a) requiring ConRail to assume the liability for vacation pay would be contrary to the legislative intent to "leave obligations with the estates but to convey assets to ConRail." *See*, ConRail's Initial Brief, page 19. ConRail admits that there are a few areas where the RRRA establishes a contrary intent, but argues that Congress specifically provides for such exceptions. This Court believes that section 504(a) is a specific exception to the general legislative scheme. The language chosen by Congress evidences a clear intent to substitute ConRail for the transferor estates in the collective bargaining agreement. Had Congress intended otherwise, it certainly would not have chosen the wording it did. Subsection (a), unlike subsections (e) and (g), does not provide for any reimbursement to ConRail. Section 211(h) makes no reference to subsection (a), but refers specifically to the employee claims covered by subsections (e) and (g), as well as section 505(a). Congress could have expressed an intent to have ConRail and the unions operate according to the *terms* of the existing agreements without using language of substitution, e. g. "assume" and "as though an original party thereto."

The transfer of equipment obligations is a notable exception to the general statutory

scheme alluded to by ConRail. Section 303(b)(3)(A)(i), which substitutes ConRail for the transferor estates in the equipment obligations, begins with the phrase "Notwithstanding any other provision of this Act . . . ." This phrase is designed to make clear that section 303(b)(2) does not apply. That section provides that all property is conveyed "free and clear of any liens or encumbrances." No such provision, however, exists with respect to the employee obligations, so there is no need for a "notwithstanding" clause. In fact, section 504(a) *is* the provision generally governing the relation of the employees to ConRail, pending the negotiation of a new overall agreement.

Even a cursory reading of the RRRA would reveal the difference in treatment accorded the employees of the transferor estates as opposed to the encumbrancers and lien holders of the transferred property. The interest of the latter in the transferred property is almost totally extinguished. The status of the employees, on the other hand, is scrupulously preserved. Section 502(b) required ConRail to make job offers to all employees of the transferor estates. Sections 504 and 505 preserve the rights of employees pending the negotiation of new agreements. Clearly the statutory scheme relating to employees differs from that relating to property. The treatment of the lien holders and encumbrancers reflects Congress' concern that ConRail be a viable corporation which will not be overpowered by a heavy debt structure. The treatment of the employees reflects Congress' concern for the well being of the employees, as well as a concern that there be no disruptive labor problems.

ConRail argues that subsections (e) and (g) of section 504 should not be interpreted as exceptions to subsection (a) because Congress would not have shifted liability to ConRail and then made exceptions. Yet, this is apparently what Congress intended to do. Subsections (e) and (g) were later additions of the RRRA via the Railroad Revitalization and Regulatory Reform Act of 1976 (hereinafter referred to as the

"RRRRA"). They encompass claims by individual employees against the estate relating to personal injuries and grievances. It is interesting to note that section 303(b)(3)(A)(i), which relates to equipment obligations, does not relieve the estates from liability for pre-conveyance breaches. In any event, it is clear that the various subsections do require different treatment of the claims which they govern.

The Court is not persuaded by the trustee's argument that the collective bargaining agreements were not adopted for use by the CNJ. Despite the fact that there was no formal approval, the agreements have been followed. Nor is the Court persuaded by the equitable marshalling argument. The section 509 funds are not available for the purposes proposed by the trustee.

ConRail must, therefore, assume payment of the vacation pay liability. This holding will undoubtedly be the subject of rebriefing and reargument in light of the newly enacted amendments, particularly sections 203 and, perhaps, 208(a). Assuming, *arguendo*, that the Court is bound to apply the amendments, the government parties will still have to contend with the apparent requirement that an employee have worked the equivalent of 100 days in 1976 before being entitled to vacation pay for 1975. If an employee was not entitled to a vacation at conveyance, the Court seriously questions whether work done for ConRail can be said to entitle an employee to a vacation at the CNJ's expense.

The Court will not decide the issue of responsibility for the last few weeks' wages at this time. That issue should be rebriefed as to the law which prevailed at the time of conveyance *and* the effect of the recent amendments.

### B. The Pension Plans

 This Court has studied the pension plan problem carefully and has concluded that the numerous issues presented therein should not now be decided. Before explaining the reasons for the Court's decision, some background would be in order.

There are currently four pension plans which relate to former CNJ employees. "Plan I", dated September 18, 1967, covers retired employees who were represented under the terms of a collective bargaining agreement and who retired on or before December 31, 1975.[20] The "Amended Plan", dated September 1, 1974, relates to retired non-contract employees who retired on or before December 31, 1975.[21] "Plan II" applies to those contract employees not covered by Plan I. "Plan III" applies to those non-contract employees not covered by the "Amended Plan." Plans II and III were effective as of January 1, 1976.[22]

Although Plans II and III were specifically designed to comply with the Employee Retirement Income Security Act (hereinafter referred to as "ERISA"), 29 U.S.C. § 1001 *et seq.,* the prior plans are also governed by some of the provisions of ERISA. *See,* 29 U.S.C. §§ 1003(a), 1051, 1081, 1101.

All four plans were transferred to ConRail pursuant to section 303(b)(6) of the RRRA. That subsection requires the Special Court to:

include in its order such further directions as may be necessary to assure (A) that the operation and administration of the employee pension benefit plans described in section 505(a) of this Act shall be continued, without termination or interruption, by the Corporation [ConRail] until such time as the Corporation elects to amend or terminate any such plan, in whole or in part; and (B) that *appropriate transfers and assignments with respect to all rights and obligations relating to such plans shall be made to the Corporation for such purposes,* without prejudice [to the rights of an estate in any residual assets.] * * * *All liabilities as an employer shall be imposed solely upon the railroad in reorganization in the event such plan is terminated,* in whole or in part, by the Corporation with-

in 1 year after the date of such transfer or assignment (except liabilities as an employer under the Employee Retirement Income Security Act of 1974 for benefits accruing during such period.) (emphasis added)

Section 505(a) has apparently been interpreted to require the transfer, pursuant to section 303(b)(6), of plans covering only non-contract employees, i. e., the Amended Plan and Plan III.

There would seem to be no doubt that none of the plans are adequately funded to provide for the benefits already accrued. Thus, the problem of who will provide the necessary funding will arise if the plans are not terminated by ConRail. If the plans are terminated, then the problem will be to identify the "liabilities as an employer" which will be "imposed solely upon" the CNJ estate.

Taking into account only the language of section 303(b)(6), this Court would be inclined to rule that ConRail must bear the burden of funding the plans, if it does not terminate them. Section 303(b)(6) clearly states that the "obligations relating to such plans" are to be transferred to ConRail along with the rights relating thereto. Funding would certainly seem to be an "obligation" "relating to such plans."

It is important to note, however, that section 303(b)(6) does more than transfer the pension plan liabilities to ConRail. It also transfers the trustee's rights under the plans, including his right to terminate, if any. All of the plans purport to give the trustee a right to terminate them at will. But, leaving aside the question of validity, it is clear that the trustee has not exercised such right prior to conveyance. It is equally clear that, at least until ConRail should decide to terminate, if then, the trustee no longer has the right to terminate the plan, the right having been transferred to ConRail.

**20.** Plan I is itself an amendment of earlier plans.

**21.** This was an amendment to Plan I.

**22.** Plans II and III are prospective amendments to Plan I and the Amended Plan respectively.

Unfortunately, section 211(h) again makes its appearance and muddies the waters. Among the "obligations" which may be paid with section 211(h) funding are "amounts required for adequate funding of accrued pension benefits existing at the time of a conveyance . . . under employee pension benefit plans described in section 505(a) of this Act." Section 211(h)(1). The Court has already determined that section 211(h) funding may only be used to pay obligations of the estates. *See* page 27, *supra.* Thus, the Court must determine whether section 211(h) indicates an intent contrary to the apparent intent of section 303(b)(6); i. e. that ConRail should assume the obligation of funding the transferred plans. Both sections were added to the RRRA by the RRRRA, section 612(1), and should, therefore, be compatible.

The legislative history is somewhat helpful. The following discussion is found in Senate Conference Report No. 94–595:

* * * The conference substitute would provide for the transfer to ConRail, as of the conveyance date, of all the rights and obligations of each railroad in reorganization with respect to such pension plans, together with a mechanism that would enable ConRail to find such shortfall if it should determine to do so, but leaving ConRail free to terminate any or all such plans, in whole or in part, within one year. In the event of complete termination, . . . the employees of any such plan would be required to look to the assets of such plan, to the trustees of the bankrupt estate and to the [ERISA procedures] for the funding of all past service pension benefits accrued as of the conveyance date. *U.S. Code Congressional and Administrative News,* 1976, No. 1 p. 217

The report goes on to say that the plans should be preserved, but that ConRail should have the flexibility to decide whether to terminate; considering, among other things, the availability of a funding source.

Among the RRRRA's "employee pension benefit provisions" are:

(3) A financing amendment to section 211(h) to provide for the funding of the foregoing shortfall.

(4) An amendment to section 509 to insure that no part of the $250 million set aside for protected employee benefits shall be applied to the continuation of the pension plans. In other words, whatever funding the pension plans may require must come *out of 211(h) or out of operating revenues.* (emphasis added) *Id.* at 218

It would seem that Congress did not intend that all funding necessarily come out of section 211(h). Only such funding as the estate was obligated to provide, as of the conveyance date, may come out of section 211(h).

In the opinion of this Court, the trustee's obligation relative to the pension plans must be examined as of March 31, 1976. If on that day, the trustee was legally obligated, either by ERISA or the Plans themselves, to have all accrued benefits fully funded, then section 211(h) funds could be used to fully fund the plans. If, on the other hand, the trustee was only obligated to have the plans partially funded, section 211(h) funds would be available only to the extent the trustee was behind in so funding the plans. If the trustee was under no obligation to have the plans funded on that date, then section 211(h) funds would not be available. To the extent section 211(h) funds are not available, ConRail must use its own operating revenue to fund such plans as it wishes to maintain. In this way, the plan obligations, as of April 1, 1976, are shifted to ConRail, while the plan obligations prior thereto remain the responsibility of the estate. Sections 211(h) and 303(b)(6) are both operative.

The Court does not feel that it is in a position to make a final determination at this point. First, the Court has no prophetic insight into ConRail's intentions with respect to the plans, although there have been indications that it intends to keep the plans. Were ConRail to terminate the plans,[23] the

---

**23.** The Court need not decide whether this action would actually terminate the plans for the

purposes of ERISA or merely revest the rights and obligations in the trustee.

Court would, under the appropriate circumstances, have to determine the estate's "liabilities as an employer" under the plans, if any. Should ConRail decide to retain the plans, the Court would have to decide the funding issue. Such determinations would be different, and the Court sees no reasons to make alternative rulings at this point. Such determinations might also involve findings of fact. In any event, the Court would want the parties to brief the issues and draw the Court's attention to the relevant portions of the plans and ERISA.

It is not unlikely that the availability of section 211(h) funding will be a factor in ConRail's decision concerning retention of the plans. In fact, the legislative history suggests as much. The Court will, of course, consider an application by ConRail, or any party, for such a determination, if the Court is persuaded that such a determination prior to ConRail's decision is appropriate. At that time, the parties may also present any arguments based on the newly enacted amendment, especially section 204.

It would seem appropriate to take a look toward the future. If there is no appeal from the ruling on issue (1), the trustee's present Plan would seem to have no future. The Court agrees with the trustee's assertion that an early reorganization would greatly benefit the estate. It is to be hoped that the principal parties will be able to reach some kind of agreement on reorganization.

▇ In the interim, the Court is sure that some of the administrative claimants will push for early payment of their claims. This must be done in a rational and orderly manner. The Court has not changed its determination that the estate will not be stripped of the assets needed to continue the reorganization. Reorganization, as opposed to liquidation, is still this Court's goal. Section 601(b)(4) gives the Court a great deal of discretion in this area.

Absent an early plan of reorganization, the Court foresees the need for a three step process to enable the Court to adequately deal with the demands for payment of administrative claims. First, the Court should determine what assets must be preserved in order to enable the trustee to function until reorganization. See, Judge Fullam's section 211(h)(3) opinion cited supra. The Court assumes, but does not decide, that these assets will consist primarily of income producing assets and unencumbered escrow accounts. Next, the Court should determine what other assets, if any, are available for distribution to the administrative claimants. This will involve the question of the availability of encumbered assets to meet administrative claims. Finally, the Court will have to determine an order of priority in the payment of administrative claims. The Court would prefer to avoid piecemeal priority hearings.

Once the three phases outlined above have been completed, a program can be set up to begin paying the claims, using the assets which are designated under phase two, the assets which might subsequently become available, and any income which is not needed by the trustee. The Court wishes to stress that its primary concern under the RRRA amendments to section 77 is "the best interests of the estate." While the administrative claimants will be dealt with fairly and according to law, some of them will clearly have to wait some time before payment. The Court will be extremely reluctant to resort to any hasty liquidations in order to satisfy the demands of administrative claimants, especially those for whose benefit the RRRA reorganization was designed.

To recapitulate, the trustee's proposal for the use of the ConRail securities under the Plan cannot, as a matter of law, be sustained. The estate is obligated to reimburse ConRail for section 211(h) funds which are used to satisfy the claims mentioned in subsections 504(e) and (g). ConRail cannot recover from the estate any money for the post-conveyance vacation of the former CNJ employees.

Finally, the Court will defer decision on the back wage and pension plan issues. As

has been stated, the parties may rebrief the employee related issues in light of the recent amendments. The trustee shall submit an order within ten (10) days from the date hereof. Such order shall be as brief as possible.

The Court would like to thank the parties for their helpful briefs and oral arguments.