**In the Matter of the CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor.**

**Appeal of R. D. TIMPANY, etc., in No. 77–1960.**

**Appeal of CONSOLIDATED RAIL CORPORATION, in No. 77–2001.**

**Appeal of UNITED STATES RAILWAY ASSOCIATION, in No. 77–2002.**

**Appeal of UNITED STATES of America, in No. 77–2104.**

**Appeal of Robert W. BLANCHETTE et al., in No. 77–2150.**

**Nos. 77–1960, 77–2001, 77–2002, 77–2104 and 77–2150.**

United States Court of Appeals, Third Circuit.

Argued March 29, 1978.

Decided June 22, 1978.

See also D.C., 425 F.Supp. 1055.

John G. Harkins, Jr., Laurence Z. Shiekman, Kennth I. Levin, Irwin A. Popowsky, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consolidated Rail Corp.

Robert J. Ross, Alan E. Kleinburd, Washington, D. C., for United States Railway Association; Cary W. Dickieson, Stephen C. Rogers, Washington, D. C., of counsel.

Barbara Allen Babcock, Asst. Atty. Gen., John H. Broadley, Atty., Sp. Litigation Section, Civ. Div., Washington, D. C., for United States of America.

Stanley Weiss, Carpenter, Bennett & Morrissey, Newark, N. J., for R. D. Timpany, Trustee of Property of Central Railroad Company of New Jersey, Debtor; Dean R. May, Newark, N. J., on brief.

William F. Hyland, Atty. Gen. of New Jersey, Stephen Skillman, Asst. Atty. Gen., Herbert K. Glickman, Douglas G. Sanborn, Michael E. Goldman, Deputy Attys. Gen., Trenton, N. J., for the State of New Jersey.

Carl Helmetag, Jr., John J. Ehlinger, Jr., Philadelphia Pa., Charles A. Horsky, Brice M. Clagett, E. Wynne M. Teel, Covington & Burling, Washington, D. C., for Trustees of the Property of Penn Central Transportation Co.

Before ADAMS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This nation has grown ever more concerned in recent years about the future of its rail transportation system, and with good cause. The significant number of bankruptcies of northeastern and midwestern railroads has prompted the public and the Congress—and, increasingly, the courts—to respond actively to the threat to the national welfare presented by the crisis of the railroads.

In this setting, highly ramified questions have been tendered to courts overseeing the progress of railroad reorganizations. Three such issues are present in this appeal, which has arisen from the reorganization of the Central Railroad of New Jersey (CNJ). First, we are called upon to decide whether the reorganization court correctly held that certain administration expenses may not be paid with the securities of the Consolidated Rail Corp. (Conrail), securities which are to be received by the estate in consideration for rail assets transferred to Conrail. Second, we must resolve whether the reorganization court appropriately determined that Conrail was liable for *vacation* benefits to which CNJ's former employees had made claims, whereas CNJ was liable for *wage* claims asserted by its former employees. Finally, we must ascertain whether the reorganization court properly ruled that Conrail was not entitled to the payment of interest on wage claims it had satisfied on behalf of CNJ's employees.

## I.

CNJ filed a petition for reorganization in March of 1967 pursuant to § 77 of the Bankruptcy Act, 11 U.S.C. § 205 *et seq.* By 1971, CNJ had embarked on a program of reorganizing its operations and structure that included, among many other things, the issuance of trustee certificates. Those certificates were issued directly by the bankrupt's trustee and were guaranteed by the Secretary of Transportation under the Emergency Rail Services Act of 1970, 45 U.S.C. § 661 *et seq.* Some $2.4 million worth of such certificates were issued and guaranteed, and CNJ's trustee ultimately defaulted on their payment.

By 1973, seven carriers, including CNJ, were in bankruptcy proceedings. In response to this situation, Congress passed the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.*, which was amended by the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801 *et seq.* (together referred to hereinafter as the "Rail Act"). The Rail Act contemplated the unification of the various rail facilities of the bankrupt companies into a single, viable system, and the conveyance of the estates' rail properties to Conrail, a newly-created private corporation. *See* 45 U.S.C. § 741. For about two years prior to the conveyance of the rail assets to Conrail, and while the United States Railway Association (USRA) was devising the Final System Plan for the railroads, CNJ and other railroads continued operations, as they were compelled to do under the Rail Act. On April 1, 1976, the rail properties were finally conveyed to Conrail, and after that date the obligation of the bankrupt railroads to maintain rail services ceased.

In exchange for the rail properties, CNJ and the other bankrupt railroads are to receive two types of Conrail securities, Series B preferred stock and common stock. To insure the payment of at least the net liquidation value of the conveyed properties, CNJ and other transferors are to obtain Certificates of Value, obligations of the United States government. *See* 45 U.S.C. § 746.[1] The Certificates of Value are to

---

1. The record indicates that the Conrail securities and the Certificates of Value are held by voting trustees, and will not be received by CNJ until distribution is ordered by the Special

guarantee that if Conrail securities ultimately have a value less than the net liquidation value of the properties conveyed to Conrail, the estates nevertheless would receive consideration equal to the assets' net liquidation value.[2]

At the time of conveyance, certain obligations that had been incurred by CNJ as a result of pre-conveyance rail operations remained unpaid. Section 211(h), one of the 1976 amendments to the Rail Act, provided the financial means by which such obligations could be satisfied "in order to avoid disruptions in ordinary business relationships." 45 U.S.C. § 721(h)(1)(A). It contemplated that outstanding obligations such as to other railroads, shippers, suppliers and labor sources could be paid by Conrail with "cash or other current assets" of the estate or, in the event that "cash or other current assets" were insufficient, with loan funds from USRA authorized under § 211(h). The statutory arrangement called for payment to the creditors of CNJ by Conrail. Conrail was then to seek reimbursement from the estate on a priority basis and, after being reimbursed by the estate, Conrail was to repay USRA. However, in the event that Conrail could not recover from the estate, USRA would, with only narrow exceptions, forgive the loan to Conrail and itself succeed to Conrail's claim for reimbursement. Payments on behalf of CNJ were made by Conrail pursuant to the authority granted in § 211(h).

During the period of CNJ's reorganization, the estate was assessed for taxes by the State of New Jersey and local governmental entities. The payment of these obligations was deferred pursuant to court order on the ground that "the public interest in the continued operation of the railroad [was] paramount over the payment of taxes," and that § 77 of the Bankruptcy Act authorized the district court to permit such deferral. *In re Penn Central Transportation Co.,* 325 F.Supp. 294, 300 (E.D.Pa.1970), *aff'd* 452 F.2d 1107 (3d Cir. 1971), *cert. denied* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972). As a result, New Jersey and its local authorities now have claims for unpaid principal and interest on taxes accruing since 1966 in the approximate amount of $22 million.

CNJ, on June 1, 1976, submitted a Plan of Reorganization to the reorganization court, as to which two preliminary questions were framed for resolution. The first dealt with the legality of the proposed use of Conrail securities by the estate to satisfy the claims (a) of the United States and the State of New Jersey under certain trustee certificates, (b) of Conrail and USRA for the reimbursement of monies paid under § 211(h) [3] and (c) of state and local authorities in New Jersey for deferred taxes. The second issue presented to the reorganization court concerned "the propriety of the trustee's position that Conrail has primary responsibility for employee-related claims," in particular those for vacations and wages.[4]

---

Court. *See* Section 301(g) of the Rail Act, 45 U.S.C. § 741(g).

**2.** In addition, should the consideration received by the estate under the Rail Act prove inadequate to avert the possibility of an unconstitutional taking, the recipients of the Conrail shares would have the option of pursuing a Tucker Act remedy in the Court of Claims. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 148–56, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

**3.** Conrail also has a claim based upon its direct payment with its own funds of certain financial obligations involving railroad rolling stock, which are said to be attributable to the preconveyance period. Conrail stresses that the Plan of Reorganization does not provide for this

claim in any way, and that it has objected to the Plan's failure to make such provision for the claim. Since we are not called upon in this case to review a determination respecting the validity of that claim by Conrail, it would seem inappropriate to make an independent legal determination with respect to it. Yet it should be noted that the broad principles adduced in this opinion regarding the proper schedule for paying administration claims pertains to other such claims.

**4.** Other "employee-related claims," such as ones advanced by employees or their personal representatives for personal injury or death and by employees for recovery from pension plans, need not detain us here, as they are not involved in these appeals.

In an opinion dated November 30, 1976, the reorganization court ruled that the proposed utilization of Conrail securities in satisfaction of the administration claims of the United States, Conrail, USRA and the New Jersey taxing authorities did not comply with the governing statute. *See* 425 F.Supp. 1055, 1060–65 (D.N.J.1976). In reaching its decision, the reorganization court relied primarily upon § 77(e)(3) of the Bankruptcy Act, 11 U.S.C. § 205(e)(3), which it interpreted as requiring the payment of administration expenses in cash unless the claimants consent to an alternative form of payment.

The reorganization court reasoned that it would be extraordinarily difficult, if not practically impossible, for it to value the Conrail securities, as that corporation's shares do not have a clear present worth or a currently ascertainable future value. As a result of this, the reorganization court concluded that "no factual finding could be made" that would enable it "to be sure that the governmental parties would receive the compensation which the absolute priority rule mandates they receive." 425 F.Supp. at 1064.

In deciding the question of liability for vacation benefits, the reorganization court turned to § 504(a) of the Rail Act, 45 U.S.C. § 774(a). That statute, in the reorganization court's view, directs Conrail to "assume"—and thus to be responsible for—obligations such as vacation benefits arising under the collective bargaining agreements covering employees of a bankrupt railroad.[5] In addition to resting its determination on the statutory language, the reorganization court cited the "practical consideration" that § 211(h) funds would not have been adequate to satisfy all the outstanding vacation obligations of the railroads. Given

this, the court concluded that Congress should not be said to have intended that vacations remained the obligations of the estates.

On May 13, 1977, the reorganization court, in a letter opinion, concluded that it was not inclined to treat wages due CNJ's employees for work during the final weeks of the railroad's pre-conveyance operation in the same manner as vacation pay. The chief reason provided for differentiating the two obligations was that "[a]ll of the benefit derived from the work for which the wages are owed went to the Central Railroad Co. of New Jersey", whereas "the benefit" from vacations taken by employees would not similarly flow to the railroad.

Further, the reorganization court refused to grant Conrail's request for interest on the wage claims. This conclusion was justified on the ground that Conrail had continued CNJ's practice of paying its employees with a two-week lapse. Thus, the court deduced, it would be "inequitable" to charge CNJ interest on wages for the two-week period prior to conveyance at a time when Conrail still does not pay its employees on a current basis. Should Conrail decide to compensate its employees in a current manner, the court indicated, but did not actually say, that a different result would likely obtain.[6]

An order was entered by the reorganization court on May 31, 1977. It held that the proposed use of Conrail securities in satisfaction of the administration claims in question did not comport with § 77(e)(3) of the Bankruptcy Act. It concluded that Conrail was liable for vacation benefits but that CNJ remained responsible for pre-conveyance wage obligations, and it determined that no interest would accrue on the funds

---

**5.** As the reorganization court wrote, 425 F.Supp. at 1068:

> ConRail is to 'assume and apply' 'all obligations under existing collective bargaining agreements' 'as though an original party thereto.' Conrail steps into the shoes of the transferor estates. This subsection contains no subsequent indication that the word 'assume' is not to be given the interpretation which the trustee sought to give it in subsec-

tions (e) and (g). Here, there is no indication that 'assume' does not mean 'to take upon oneself the obligations of another.'

**6.** The reorganization court stated that "ConRail will not be permitted to accrue interest on the amount owed to it by the Trustee for the wages until such time as the former Central Railroad Company of New Jersey employees are paid on a current basis."

borrowed by Conrail to pay sums owed as wages, at least "until such time as Conrail shall begin paying such employees on a current basis."

The present appeals have been taken from the May 31st order. Specifically, CNJ has challenged the rulings relating to the use of Conrail securities and the wage claims; Penn Central has urged this Court not to affirm the determination of the reorganization court regarding the proposed use of Conrail securities;[7] Conrail has appealed from the reorganization court's holding regarding vacation pay; and both the United States and USRA have appealed the decision not to award interest on the pre-conveyance wage obligations.

## II.

Because the three issues in the present appeal implicate discrete aspects of the law governing railroad reorganizations, we shall discuss them *seriatum.*

## A. THE PROPOSED USE OF CONRAIL SECURITIES

According to CNJ, the proposed use of Conrail securities is not precluded by § 77(e)(3) of the Bankruptcy Act and, indeed, is affirmatively authorized by § 601(b)(4) of the Rail Act. Also, the trustee argues that the proposed use of Conrail securities does not violate the absolute priority rule arising under § 77(e)(1) of the Bankruptcy Act. In response, it is urged that the various claims, for purposes of the Rail Act and the Bankruptcy Act, are administration claims, and as such are entitled to first priority and payment in cash. Appellees also insist that even if § 77(e)(3) of the Bankruptcy Act is not dispositive of the matter, the absolute priority rule forecloses

the proposed use of . Conrail securities. They further dispute CNJ's contention that the grant of discretion to a reorganization court under § 601(b)(4) of the Rail Act permits the conclusion that the use of Conrail securities is acceptable.

The reorganization court did not confine its reasoning to the propriety of the use of Conrail securities, but reached more broadly in concluding that under § 77(e)(3) of the Bankruptcy Act, *all* administration expenses such as those here must be paid *in cash.* We decline to follow the lead of the reorganization court in ruling on the legality of a form of payment of all of the obligations of concern here—specifically, cash—that is not contemplated in the Plan of Reorganization.

■ As a general matter, it is not advisable to resolve questions, particularly ones with wide-ranging implications, that are not immediately presented in a case.[8] The issue in this appeal is not whether cash payment is required, but rather, whether the proposed use of Conrail securities is legal. Thus, the question that must be addressed is narrower than that which occupied the reorganization court, specifically, it is whether the proposed method of payment—the use of Conrail securities—is allowable under controlling statutory precepts.

To put the precise issue at hand into a broader perspective, it is necessary to understand the priority of the estate's claimants and creditors under the Plan of Reorganization. As described by the reorganization court, the Plan basically contemplated a tenfold division of the estate's obligations. The reorganization court wrote:

The Plan divides the estate's creditors into ten classes listed in descending order

---

**7.** Penn Central trustees assert claims against CNJ for interline freight balances and billings related to rail services, and have participated in the reorganization proceedings involving CNJ. Penn Central's primary argument on appeal is that a decision regarding the propriety of the proposed use of Conrail securities should not sweep beyond the facts of this case, for it might jeopardize the reorganization plans of Penn Central and other estates.

**8.** *Cf. Conover v. Montemuro,* 477 F.2d 1073, 1093–94 (3d Cir. 1973) (Opinion of the Court sur Petition for Rehearing) where the Court declined to "decide an issue not necessary to the disposition of the case, at least at this stage," adding: "Upon an issue of such significance, when to decide is not necessary, it may well be necessary not to decide."

of priority. Class A consists of such costs of the reorganization proceedings and the Plan's implementation as this Court shall allow. Non-employee personal injury claims are also included in this class. Class B contains the claims of the United States and the State of New Jersey under certain trustee certificates. Class C covers the § 211(h) claims to reimbursement by ConRail and/or USRA. Class D consists of such state and local tax claims as shall be allowed.

The interline railroad's claims for thirty-five monthly cash payments under the pre-petition interlines settlement comprise Class E. Class F includes all other administration claims. Class G consists of the mortgage bondholders. Class H comprises the claims of the United States under certain trust notes. All other pre-petition claims are contained in Class I. . . . Finally, the interest of the stockholder is denominated Class J.[9]

In this hierarchy of claims, it should be noted, the claimants to receive Conrail securities are Classes B, C and D.[10] However, Class E claims are to be paid in thirty-five monthly cash installments; Class F creditors are to "receive certain installment notes to be issued by the reorganized company"; the bondholders, Class G creditors, are to receive the common stock of the reorganized company; and Class H debts are to be satisfied "by the release of the securities of certain of CNJ's subsidiaries".[11] As we see it, the central inquiry is whether such an apportionment of resources conforms with the absolute priority rule deriving from the Bankruptcy Act.[12]

■ Section 77(e)(1) of the Bankruptcy Act, 11 U.S.C. § 205(e)(1), is the source of the absolute priority principle. That section provides that a judge shall approve a plan of reorganization "if satisfied that":

It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders . . . .

The term "fair and equitable" in the statutory language has a long history reaching back at least to *Northern Pacific Ry. Co. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913) and *Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926). As the Supreme Court put it in *Baker v. Gold Seal Liquors,* 417 U.S. 467, 473, 94 S.Ct. 2504, 2508, 41 L.Ed.2d 243 (1974), the "fixed principle" of the earlier cases "has been carried over into § 77e by our decisions." *See also Ecker v. Western Pacific Ry. Corp.,* 318 U.S. 448, 477–83, 63 S.Ct. 692, 87 L.Ed. 892 (1943); *Group of Institutional Investors v. Milwaukee Ry. Co.,* 318 U.S. 523, 539–41, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *RFC v. Denver & R.G.W. Ry. Co.,* 328 U.S. 495, 615–20, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946). The priority standard requires that claimants and creditors of a bankrupt estate of the same class receive the full value of their debts from the property of the debtor before junior creditors and shareholders are paid. *See Baker v. Gold Seal Liquors, supra,* 417 U.S. at 473–74, 94 S.Ct. 2504; *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 528–29, 61 S.Ct. 675, 85 L.Ed. 982 (1941).[13]

The clearest application of the absolute priority rule has occurred when a plan of reorganization proposes to treat sharehold-

---

**9.** 425 F.Supp. at 1059.

**10.** Class A claims are to be paid in cash or "assumed by the reorganized company." 425 F.Supp. at 1059.

**11.** 425 F.Supp. at 1059. The stockholders "will receive nothing unless certain contingencies . . . should occur." *Id.*

**12.** That is, the issue is whether giving Conrail securities to the administration claimants in question, on the one hand, and giving the other assets named in the plan to the lesser claimants, on the other hand, is legally acceptable.

**13.** *See also Group of Institutional Investors v. Milwaukee Ry. Co.,* 318 U.S. 523, 563, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

ers more beneficially than, and thus prior to, creditors. In *Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.,* 174 U.S. 674, 684, 19 S.Ct. 827, 830, 43 L.Ed. 1130 (1899), the Supreme Court reaffirmed the "familiar rule" that "the stockholder's interest in the property is subordinate to the rights of creditors; first, of secured and then of unsecured, creditors." It proceeded to announce that "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation." Also, in *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra,* 271 U.S. at 455, 46 S.Ct. at 551, it was written that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation."

Yet the absolute priority standard has not been confined to maintaining a strict gradation between creditors and shareholders; it also has been seen to apply to the situation of differing priorities among creditors or claimants themselves. In *United States v. Key,* 397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970), the Supreme Court held—in the context of a Chapter X proceeding—that the United States is entitled to priority payment of its tax claim under a plan of reorganization. In a concurring opinion, Justice Douglas noted that the terms "fair and equitable" under Chapter X are "words of art" which, as the Court has made clear, establish "unmistakably . . . that compromising the rights of senior creditors to protect junior creditors" is unacceptable. 397 U.S. at 333, 90 S.Ct. at 1056. *Cf. Case v. Los Angeles Lumber Co.,* 308 U.S. 106, 115–16, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Justice Douglas wrote in *Key*:

The present plan is likewise infirm because it provides junior creditors with immediate, partial payment, while mak-

ing the United States with a prior claim accept delayed and therefore discounted payment of its claim with all the attendant risks.[14]

We discern no basis for distinguishing the priority principle as applicable under Chapter X bankruptcies from the same standard as applied under § 77(e) of the Bankruptcy Act, and neither has the Supreme Court. *See Baker v. Gold Seal Liquors, supra,* 417 U.S. at 473 n. 11, 94 S.Ct. 2504.

■ Accordingly, the absolute priority principle mandates a schedule of payment that accords with the ranking of the various claimants of an estate. It does not "require the impossible and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock." *Northern Pacific Ry. Co. v. Boyd, supra,* 228 U.S. at 508, 33 S.Ct. at 561.[15] On the other hand, the rule does demand, once a fixed scale of interests is established, that each class receive satisfaction before the next lower class participates. *See* Friendly & Tondel, *The Relative Treatment of Securities in Railroad Reorganization Under Section 77,* 7 Law & Contemp. Probs., 420, 423 (1940).

The three types of obligations of concern here—those arising from default of trustee certificates, from payment of creditors under § 211(h) of the Rail Act, and from the deferral of taxes—are claims of administration entitled to first priority.[16] Section 3(c) of the Emergency Rail Services Act of 1970, 45 U.S.C. § 662(c), requires that trustee certificates be:

. . . *treated as an expense of administration* and receive the highest lien on the railroad's property and priority in

---

**14.** 397 U.S. at 334, 90 S.Ct. at 1056.

**15.** *See also Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445, 454–55, 46 S.Ct. 549, 70 L.Ed. 1028 (1926).

**16.** The determination that the claims are administrative in nature for purposes of the absolute priority rule is, of course, distinct from the question whether they are "costs of administration" for purposes of § 77(e)(3). We do not reach the latter question.

payment under the Bankruptcy Act. (emphasis added) [17]

The Rail Act also stipulates that claims arising under § 211(h), whether advanced by Conrail or by USRA, are administration expenses. As § 211(h)(4)(C) of the Rail Act, 45 U.S.C. § 721(h)(4)(C), provides with regard to such claims pressed by Conrail:

The Corporation . . . shall have a direct claim, as a *current expense of administration,* for reimbursement from the estate of a railroad in reorganization in the region for all obligations of such estate . . . which are paid by the Corporation . . . (emphasis added)

And with respect to direct claims of USRA for the reimbursement of § 211(h) funds, the statute declares that they "shall be *prior to all other administrative claims of the estate of a railroad in reorganization, except claims arising under trustee's certificates* or from default on the payment of such certificates." 45 U.S.C. § 721(h)(5)(B) (emphasis added). In addition, tax claims such as those pressed by the authorities in New Jersey constitute administration claims, though they are not of the very first priority as, for instance, are trustee certificates. *See Nicholas v. United States,* 384 U.S. 678, 687–88, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966); *cf.* 3A *Collier on Bankruptcy* § 62.14(3); 6 *Remington on Bankruptcy* § 2823 (5th ed. 1952).

Given their priority status, the claims in question must be paid before non-adminis-tration and lower priority claims. However, the Plan of Reorganization contemplates the distribution to bondholders, for example, of the common stock of the reorganized company. It appears from the record that common shares would likely, or at least possibly, be more valuable in the foreseeable future than Conrail's shares. No dividends are to be paid on the Series B preferred stock of Conrail until 1985, and dividends on Conrail's common stock would not be paid earlier than those on the Series B preferred shares. However, it is at least possible that the reorganized company may start to operate at a profit, and thus to make distributions to its shareholders, at an earlier date. In any event, and more crucially, there is no evidence that Conrail shares are more valuable than shares of the reorganized company. Furthermore, the Plan of Reorganization contemplates a distribution of cash to administration claimants with a lower priority than the three types of administration claimants involved in this set of appeals.[18] Consequently, the Plan's proposed use of Conrail securities does not adhere to the strictures of the absolute priority rule, and cannot be sustained.[19]

The reorganization court made another observation, based on what it referred to as the *"indirect* absolute priority rule" (emphasis added), that undermines the validity of the proposed use of Conrail securities. The court noted that it would be extremely

---

**17.** The United States, in its brief, has also referred to comments in the legislative history that reiterate the point about the priority of claims relating to trustee certificates.

**18.** It does not matter for purposes of our inquiry that eventually Conrail is expected to succeed financially. That Conrail's current value is speculative and uncertain is enough to indicate that cash is plainly a superior consideration which, if it is to be distributed, must be distributed to claimants with the highest priorities.

**19.** This conclusion is to be sharply distinguished from saying that the Plan violated § 77(e)(3) because it does not provide for payment of the claims in cash. Since we do not consider forms of payment other than the one proposed in the Plan, once again, we do not reach the broader question posed by the reor-ganization court. That not only is not necessary, given our determination regarding the application of the absolute priority rule in this case, but also it comports with the principle that flexibility must be the hallmark of railroad reorganizations. Thus, while we have concluded that the use of Conrail securities is violative of the absolute priority rule, we have designedly not addressed the issue of the legality of alternative forms of payment, such as installment notes, securities of the reorganized company, or even Conrail securities with certificates of value. Moreover, our conclusion should not prejudice the Penn Central's Plan of Reorganization, which, as we understand it, does not contemplate the use of Conrail securities as a means of paying administration claims.

difficult, if not impossible, for it at this time to value the Conrail securities so as to determine the exact amount of compensation to be received by the administration claimants. Judge Whipple wrote:

*The Court can not but conclude that no factual finding could be made which would enable it to be sure that the governmental parties would receive the compensation which the absolute priority rule mandates they receive. Had the Plan provided for the participation of the governmental parties in the assurances provided by the Certificates of Value, the indirect absolute priority rule argument might not have been a factor in the decision which the Court has reached. (emphasis added)* [20]

The proposed transfer of Conrail securities without Certificates of Value guaranteeing that they are worth at least the net liquidation value of the assets transferred to Conrail would thus appear to give the recipients no assurance of any minimal worth of the shares. It therefore is not certain that the claimants receiving Conrail shares would receive full satisfaction of their claims.

In response, CNJ contends that § 601(b)(4) of the Rail Act, 45 U.S.C. § 791(b)(4), operates to free the reorganization court from the constraints of the absolute rule. That section provides:

The powers and duties of the Commission (ICC) under section 77 of the Bankruptcy Act, with respect to a railroad in reorganization in the region which conveys all or substantially all of its designated rail properties to the Corporation . . . shall cease upon the date of such conveyance. The powers and duties of the Commission under section 77 of the Bankruptcy Act shall also so terminate, as of the date of enactment of this paragraph, with respect to any railroad reorganization under section 77 but not subject to this Act . . . *Thereafter, such powers and duties of the Commission shall be vested in the district court of the United States which has jurisdiction of the estate . . . Such court shall proceed to reorganize or liquidate such railroad in reorganization pursuant to such section 77 on such terms as the court deems just and reasonable, or pursuant to any other provisions of the Bankruptcy Act, if the court finds that such action would be in the best interests of such estate . . .* (emphasis added)

We do not see in that section any legislative purpose other than an intent to lodge in the reorganization court the responsibilities traditionally executed by the ICC. To say that the section's use of language calling for "just and reasonable" terms in a plan of reorganization is a method of repealing the "fair and equitable" standard of § 77 of the Bankruptcy Act is untenable. As Conrail points out, the Rail Act in general has been viewed by the Supreme Court as basically supplementing, and not displacing, the Bankruptcy Act. *Cf. Regional Rail Reorganization Act Cases,* 419 U.S. 102, 109, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Moreover, the trustee has identified no legislative history persuasively demonstrating the aim of Congress, in enacting § 601(b)(4) of the Rail Act, dramatically to alter the scope of the venerable rule of absolute priority. In the absence of an affirmative indication of such Congressional design, it would be inappropriate to infer an intent to repeal the established doctrine.[21]

The trustee further maintains that the appellees should be precluded from urging that Conrail securities constitute legally inadequate consideration for the outstanding claims. As CNJ frames the argument, having "engineered the transfer of the bulk of CNJ's assets in return for the ConRail securities," and having "consistently argued that such securities were an adequate form

---

**20.** 425 F.Supp. at 1064.

**21.** We also find no basis in the record for accepting the trustee's argument relating to the doctrine of equitable subordination. Further, we cannot accept the suggestion that the standard under the Fifth Amendment in determining whether the transfer of rail assets to Conrail amounted to an unconstitutional taking of property is the same as the absolute priority rule, for the two inquiries are directed at different objects.

of compensation for CNJ's assets," they should now be prevented from taking the position that Conrail securities are legally unacceptable as payment *to them.* However, it does not appear that the notion of preclusion is relevant here, at least not in the manner it is sought to be applied by the trustee. Although there may be an occasion to prohibit a party from taking inconsistent positions in successive proceedings as to the same matter, that occasion has not arisen because the subject of the proceedings involved in this appeal is not the same as in the valuation case relied on by the trustee as the alleged basis for preclusion. We must be guided ultimately by the dictates of the governing statutory principles bearing on the priority of claimants.

There remains the question whether any one of the three types of administration claims present in this appeal has a unique status, entitling it to more specific protection than that afforded by the absolute priority rule. For all that we have thus far concluded is that, under the facts of this case, the proposed use of Conrail securities as payment of the administration expenses is unacceptable.

The trustee certificates, in our view must be given special consideration. Under Section 3(c) of the Emergency Rail Services Act of 1970, 45 U.S.C. § 662(c), trustee certificates are to be treated "as an expense of administration" and as "the highest lien on the railroad's property and priority in payment under the Bankruptcy Act." The particular importance of such certificates to a bankrupt railroad is manifest, as they provide a necessary means of raising capital at a critical time. A railroad in reorganization must often have the power to borrow funds at reasonable rates of interest "if it is to remain a viable railroad." *In re New York, New Haven & Hartford Ry. Co.,* 304 F.Supp. 1121, 1125 (D.Conn.1969).

On the second page of the trustee certificates, the record indicates, it is provided that:

*The principal will be paid in Federal funds upon surrender of this certificate on or after maturity* at the Bank. . . . The interest will be paid by check. The final installment of interest will be paid with the principal. (emphasis added)

The terms of the trustee certificates, which call for payment of their principal in federal funds, should be respected and not unilaterally modified under the Plan of Reorganization, for an essential element in the marketing of trustee certificates is to insure purchasers that they will receive what they bargained for. Thus, the certificates' terms should be "meticulously observed, *unless* the obligor and obligee mutually agree upon other terms." *In re New York, New Haven & Hartford Ry. Co., supra* (emphasis added).

■■ We hold, in sum, that under the rule of absolute priority, the proposed use of Conrail securities in satisfaction of the administration claims in question is unacceptable. After deciding the issue in light of the absolute priority rule, it is neither essential nor, in our judgment, fitting to reach the broader question regarding the allowability of the use of securities generally under § 77(e)(3) of the Bankruptcy Act. Furthermore, we hold that the trustee certificates must be paid in the manner provided by their terms, unless the parties consent to an alternative form of payment.[22]

### B. EMPLOYEE–RELATED CLAIMS: VACATIONS AND WAGES

The reorganization court relied upon § 504(a) of the Rail Act, 45 U.S.C. § 774(a), in requiring Conrail to be responsible for vacation benefits owed CNJ's former employees. That section states:

(a) Interim Application.—Until completion of the agreements provided for under subsection (d) of this section, the Corporation shall, as though an original par-

---

**22.** The term "federal funds" has a specific meaning in the parlance of the Federal Reserve system, dealing with the need for funds to cover momentary shortages in a given bank in the system, which is not relevant here. The use in this context appears to contemplate payment in cash or negotiable paper of a determinate value. However, on the record before us, we cannot make a definitive ruling on the subject.

ty thereto, assume and apply on the particular lines, properties, or facilities acquired all obligations under existing collective-bargaining agreements covering all crafts and classes of employees thereon . . . During this period, employees of a railroad in reorganization who have seniority on the lines, properties, or facilities acquired by the Corporation pursuant to this Act shall have prior seniority roster rights on such acquired lines, properties, or facilities.

According to the reorganization court, the import of that statutory language, which was said to be "clear and unambiguous," is that Conrail must take upon itself the estate's obligation regarding vacations by employees. The court declined to credit Conrail's argument that the statutory provisions are clearly interim in their operation and therefore that no final liability falls upon it. Moreover, the court stressed that nothing in the statute as a whole indicates that even if the obligation to pay for vacations is Conrail's in the first instance, it shifts back to the estate when a new collective bargaining agreement comes into effect.

One policy apparently underlying the court's analysis was the desire to effectuate the legislature's intent to protect employees from disruption of their interests under the collective bargaining agreements after the conveyance of assets to Conrail. *See* 425 F.Supp. at 1070. The court construed § 504(a) as an "exception to the general legislative scheme" of the Rail Act, which, it tacitly recognized, tended to leave pre-conveyance obligations with the estates.

By thus concluding that all vacation benefits in question are the responsibility of Conrail and not CNJ, the reorganization court found it unnecessary to differentiate between various categories of vacation claimants. However, some of the claims for vacation benefits are for the vindication of vested rights, and others are not. Thus, certain employees had earned vacation benefits during *1975*—the calendar year prior

to conveyance on April 1, 1976—but had not taken their vacations before conveyance. Such rights would seem clearly to have vested. Other employees had accumulated enough working time from January 1, 1976, to March 31, 1976, to vest their *1976* vacation benefits, which they were to receive in 1977. A third group of employees had accumulated only some but not all of the time required to vest their *1976* vacation benefits prior to conveyance. Considering the contrasting positions of these three sets of employees, the blanket approach of the reorganization court would appear to be too undiscriminating *unless* it was correct in holding that *all* vacations are the obligation of Conrail.

We cannot agree with the reorganization court's ultimate conclusion. The statute that it relied upon does not, in our view, suggest that Congress intended Conrail to bear final liability for all vacation obligations arising in the pre-conveyance period. Rather, Congress basically evinced a concern about preventing confusion and unfairness in the relations between the employees and their new post-conveyance employer, namely, Conrail. By virtue of that concern, § 504(a) was passed, with an explicitly "interim" orientation, to define the employment relations that would obtain until a new collective bargaining agreement came into operation.[23] In particular, during this interim period, Conrail was directed to "assume and apply"—that is, to adhere to—obligations arising under existing collective bargaining agreements. *Cf. Carle v. Conrail,* 426 F.Supp. 1045, 1046 n.1 (S.D.N.Y. 1977). Section 504(d), 45 U.S.C. § 774(d), required Conrail and the unions representing the employees to begin to negotiate new labor contracts within sixty days of conveyance. In focusing on the language of §§ 504(a) and (d), then, we are led to the interpretation that Congress primarily determined to provide a stable framework for labor-management relations, and not to fix

---

**23.** The section is headed, "Interim Application," and by its terms is to apply "[u]ntil completion of the agreements provided for under subsection (d) of this section."

on Conrail pre-conveyance obligations for vacation pay formerly borne by the estate.[24]

Conrail argues that the language of § 504(e), and the legislative materials elucidating its 1976 amendments, affirmatively support the proposition that obligations for vacation pay are properly reposed with CNJ. Section 504(e) in pertinent part is as follows:

> Liability for employee claims.—In all cases of claims by employees, arising under the collective bargaining agreements of the railroads in reorganization in the region, and subject to section 153 of this title [section 3 of the Railway Labor Act], *the Corporation . . . shall assume responsibility for the processing of any such claims, and payment of those which are sustained or settled on or subsequent to the date of conveyance, under section 743(b)(1) of this title, and shall be entitled to direct reimbursement from the Association pursuant to section 721(h) of this title, to the extent that such claims are determined by the Association to be the obligation of a railroad in reorganization in the region. Any liability of an estate of a railroad in reorganization to its employees which is assumed, processed, and paid, pursuant to this subsection, by the Corporation . . . shall remain the preconveyance obligation of the estate of such railroad for purposes of section 721(h)(1) of this title. The Corporation . . . shall be entitled to a direct claim as a current expense of administration . . . for reimbursement (including costs and expenses of processing such claims) from the estate of the railroad in reorganization on whose behalf such obligations are discharged or paid. . . .* (emphasis added)

Conrail stresses in particular the language that a liability assumed by it, pursuant to the above subsection, "shall remain the preconveyance obligation of the estate . . .",

and that Conrail shall be "entitled to a direct claim as a current expense of administration" for "reimbursement . . . from the estate . . ."

The reorganization court, in rejecting Conrail's suggestion, concluded that § 504(e) does not apply to vacation claims that are not subject to § 3 of the Railway Labor Act, which deals with "disputes between an employee or group of employees and a carrier . . . growing out of grievances or . . . the interpretation or application of the agreements concerning rates of pay, rules, or working conditions . . ." 45 U.S.C. § 153(i). Since the controversy here is between the estate and Conrail, not between the carrier and employees, the reorganization court deemed that § 504(e) did not cover the matter in question.

As we see it, the interpretation by the reorganization court does not rest upon a straight-forward reading of the statutory language. Section 504(e) applies to all "cases of claims by employees, arising under the collective bargaining agreements . . . and subject to section 153 of this title [section 3 of the Railway Labor Act]." The "subject to" clause does not indicate that the provisions of Section 3 of the Railway Labor Act have to be in actual operation with respect to the claim in question. It would appear more reasonable to construe it to mean that *if* a dispute between an employer and employee exists, then the provisions of § 3 of the Railway Labor Act will be brought to bear upon it, for in any event the claims are "subject to" the terms of that Act.

Moreover, as Conrail properly points out, the reorganization court's interpretation of § 504(e) would lead logically to the conclusion that the estate has no liability for claims that it does not dispute, but it does have liability for claims it chooses to con-

---

24. In addition, Conrail points out that when Congress evidenced approval of the Final System Plan, *see* § 208(d)(1), 45 U.S.C. § 718(d)(1), it was undoubtedly aware of the fact that USRA had indicated a "zero" balance sheet liability for vacation pay for Conrail. Had Con-

gress nonetheless intended to impose liability on Conrail for the vacations, it appears unlikely that it would have manifested such intent indirectly and only by inference from Section 504(a).

test. No statutory policy would appear to be served by distinguishing between situations of liability and no liability solely on the basis of the estate's decision to question its own obligation. It thus seems that the language of the section should be read to cover the present case.[25]

The trustee counters by noting that § 504(e) pertains only to claims "sustained or settled on or subsequent to the date of conveyance," and by asserting that such language *implies* that the claims are expected to concern contested matters. Such an implication is, however, a remote one. Moreover, the trustee's argument is not sufficiently specific to compel the result it seeks, for it does not show that the statute—even assuming that it contemplates an actual, realized dispute—requires a contest between the employer and the employees, as opposed to one between Conrail and the trustee. In any event, the argument does not impel rejection of the conclusion that has been reached.

Further, the trustee maintains that even if it is liable for the vacations of employees whose benefits vested in 1975 or in 1976 prior to conveyance, it does not, and never did, have an obligation to pay vacation benefits to that group of employees who did not work long enough in 1976 before conveyance to be entitled to vacations. This position rests on the premise that the estate is not liable for vacations unless an employee has accumulated all of the time credits needed to vest the entitlement prior to the conveyance. The estate buttresses this argument by saying that the employees who before conveyance had no entitlement to vacations "had not met the conditions of their agreement with CNJ with respect to vacation benefits." For this reason, says the estate, the claims for vacation that had not vested at the time of conveyance do not

constitute a "liability of an estate of a railroad" under the Rail Act.

Conrail in response points to the estate's accrual method of accounting, under which an entry was shown on the railroad's books for vacation benefits in the period in which income from railroad operations was generated, regardless of whether or not cash was eventually to be spent to satisfy the employees' claims for vacations. Thus, as framed by Conrail, the issue is who must bear the ultimate liability for vacation benefits listed on CNJ's books, but of course not paid before conveyance. On this reasoning, the claims of both the small group of employees who, prior to conveyance, accumulated enough time credits in 1976 to vest their vacation benefits and of the larger group of employees who, prior to conveyance, earned only a portion of the credits needed to vest their vacation benefits would be obligations of the estate at the time of conveyance. As to both classes, Conrail proposes that we direct a process of apportionment of the ultimate responsibility between CNJ and Conrail, by a method to be determined by the reorganization court.

We cannot say that failing to apportion liability for vacation benefits entered on the books in 1976 but not vested prior to conveyance amounted to an abuse of discretion on the part of the reorganization court. We are simply not convinced that the method of accounting utilized by the estate is the appropriate basis, at least in this case, for determining whether employee vacations constituted a "liability of an estate of a railroad" under the Rail Act. Rather, the existence of a firm *contractual* obligation, which arises when the benefits vest, would appear to be a more appropriate benchmark of the railroad's liability for vacation benefits at the moment of conveyance.[26]

25. The estate has attempted to rely in part on *In re Penn Central Transportation Co.,* 411 F.Supp. 1079, 1086–90 (E.D.Pa.1976). However, for the reasons stated, we do not accept the conclusion of that decision that "the ultimate responsibility for pay during 1975 and subsequent vacation periods rests with Conrail," 411 F.Supp. at 1089.

26. *Cf. In re Erie Lackawanna Railway Co.,* 577 F.2d 368 at 370 (6th Cir., filed June 9, 1978) (discussing the Rail Transportation Improvement Act of 1976 [RTIA], Pub.L. 94–555, §§ 203(a)–(b), 90 Stat. 2613 (1976), which amended § 211(h) of the Rail Act: "The plain meaning of the quoted amendments is that *accrued* vacation benefits remain an obligation of the estate in reorganization, and that Conrail as

Using this guide, we hold that CNJ is responsible for those vacation benefits that had vested prior to conveyance, and Conrail is liable for the vacation benefits that vested after conveyance.

The next question, regarding liability for wages, raises the issue whether wages and vacations should be treated as analytically separable, as the reorganization court considered them to be. It sought to distinguish the two matters on the ground that the gain from the award of vacations—presumably involving employee good will toward the company—flowed mainly to Conrail, although such gain from payment of wages in the pre-conveyance period accrued chiefly to CNJ.

However, the problem with the reorganization court's reasoning is that it fails to take adequate account of the governing statute, which does not make the kind of distinction advanced by the court. For the very reasons that CNJ is liable for vested vacation benefits arising in the pre-conveyance period, it likewise is liable for pre-conveyance wages as they are earned. Indeed, as the trustee itself suggests, there is no rational basis in the statute for treating differently the liabilities for each of the two subjects.

■ We thus conclude that the reorganization court correctly ascertained that the wages earned in the pre-conveyance period constitute an obligation of CNJ.

## C. INTEREST ON THE WAGE CLAIMS

In support of the determination by the reorganization court that interest should not be paid to Conrail on the wage claims in question, CNJ argues that the court's conclusion resulted from an exercise of the general equitable powers conferred upon it by the Bankruptcy Act. Such powers, the trustee urges, "clearly include that of the allowance or disallowance of any claim . . . on equitable grounds." Further, CNJ suggests that § 601 of the Rail Act reveals no limitations on the reorganization court's equitable authority bearing on the ruling about interest.

Yet, in our consideration, the requirement to pay interest on the wage claims contested here is a product of the funding scheme established by § 211(h). In order to amass the monies used to make loans under § 211(h), USRA is empowered under the Rail Act to issue obligations guaranteed as to principal and interest by the Secretary of Transportation. The inability of Conrail or USRA to obtain interest from CNJ on the claims for administration expenses resulting from the payment of wages on behalf of CNJ would predictably lead to difficulties on the part of USRA in redeeming the obligations. Inevitably, the government would have to satisfy the deficiency. In view of this difficulty, and in order to allow no interest to be paid, it would appear necessary to find a statutory authorization to that effect. But upon review, it seems that the statute generates exactly the opposite result, namely, that payment of interest *is* contemplated.

Section 211(h)(4)(C) of the Rail Act, 45 U.S.C. § 721(h)(4)(C), states that:

> The corporation . . . shall have a direct claim, as a current expense of administration, for reimbursement from the estate of a railroad in reorganization in the region for all obligations of such estate (*plus interest thereon*) which are paid the Corporation . . . .. The right of the Corporation . . . to

payor of such benefits is entitled to a claim for reimbursement against the estate . . . (I)t had been Congress' original intent that the EL estate be charged with liability for such vacation benefits as were '(*earned* . . . by working for the estates in 1975 and in the first three months of 1976'" [emphasis added]). By focusing on whether the benefits had been earned, and in that sense accrued, the Sixth Circuit thus focused not on a method of accounting but on the existence of an underlying entitlement on the part of the employees. The Sixth Circuit left open the question "whether rights vesting after conveyance, if any, constitute 'accrued vacation . . . arising in connection with labor and services performed,' and rights 'earned . . . by having worked for the estates . . . in the first three months of 1976.' within the contemplation of the Rail Act as amended, and of the relevant collective-bargaining agreements." *Id.* at 371.

receive reimbursement under this subparagraph from the estate of a railroad in reorganization in the region shall be reduced by the amount, if any, of loans, plus interest forgiven under paragraph (5) of this subsection. (emphasis added)

The pertinent part of paragraph 5 of the subsection, § 211(h)(5), provides that upon the succession of USRA to Conrail's claim for reimbursement:

The Association shall have a direct claim, as a current expense of administration of the estate of such railroad in reorganization, equal to the amount by which loans of the Corporation or of the National Railroad Passenger Corporation, *plus interest,* have been forgiven . . . (emphasis added)

Conrail is thus to be allowed interest on its claim against the estate for the monies expended under § 211(h). And it appears reasonable to read these provisions as establishing that the interest pertains to the § 211(h) loan from USRA to Conrail.[27]

As the United States has pointed out, the fact that Conrail continues to defer payment of its employees' wages is primarily a matter between it and its employees, not between it and CNJ. It does not basically affect the discrete statutory question whether the estate or Conrail has the responsibility for payment of wages for the two weeks prior to conveyance.

Accordingly, we conclude that the reorganization court exceeded its discretion by refusing to grant interest on the wage claims except upon execution of a condition not contemplated by the statute, and that interest should be paid.

### III.

To summarize, (1) the proposed use of Conrail securities to pay the high-priority administration claims in question contravenes the absolute priority rule and thus cannot be sustained; (2) the trustee certificates must be paid in accordance with their terms; (3) vacation benefits that had vested at conveyance are the obligation of CNJ, and vacation benefits that had not so vested are the obligation of Conrail; (4) wages earned for work performed in the pre-conveyance period are the responsibility of CNJ; and (5) interest on the sums advanced on behalf of CNJ for wage claims should be paid by CNJ to Conrail.

The order of the reorganization court will be vacated, and the case remanded for proceedings consistent with this opinion.

---

**27.** As the United States has indicated, the applicable legislative history is not to the contrary.